## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| In re | |
| **DONALD A GATZKE**, | Case No.  **06-60037-11** |
| Debtor. | |
| **DONALD A GATZKE**, | |
| Plaintiff. | |
| -vs- | |
| **JAMES CHRISTIAN, BEARCAT DRILLING AND PUMP COMPANY, LLC, NORTHSTAR DEVELOPMENT OF MONTANA, LLC, NORTHSTAR PROPERTIES, LLC, GLACIER CROSSROADS, A CORPORATION**, and **ROCKY MOUNTAIN LUMBER COMPANY LLC**, | Adv No.  **06-00056** |
| Defendants. | |

## MEMORANDUM   OF   DECISION

At Butte in said District this 27th day of March, 2007.

Several matters are pending in the above-captioned adversary proceeding and Chapter 11 case, which were consolidated for trial held, after due notice, at Missoula, Montana, beginning on November 2, 2006, and concluding November 6, 2006.  After trial and review of the parties' briefs, the transcript and applicable law, these matters are ready for a decision.  A separate Judgment and Orders shall be entered in favor of the Plaintiff Donald A. Gatzke ("Gatzke")

1

against the Defendants, for the reasons set forth below, in this adversary proceeding and the main Chapter 11 case:  (1) awarding Gatzke the sum of $152,701.47 against Defendants James Christian ("Christian") and Northstar Properties, L.L.C. ("Northstar Properties") based on an accounting pursuant to their written agreement to develop a subdivision in Flathead County, Montana, knows as "Harmony Court", plus attorney fees and costs; (2) disallowing Proof of Claim No. 11 filed by the Defendant Northstar Development of Montana, L.L.C. ("Northstar Development") on March 31, 2006; (3) disallowing Proof of Claim No. 10 filed by Christian on March 31, 2006, in the amount of $1,101,599.37, but allowing Christian an unsecured, nonpriority claim in the amount of $5,394.37; and (4) declaring that Christian and/or Northstar Properties have no ownership interest in, and no right to share in the proceeds from development of, a subdivision located near Columbia Falls, Flathead County, Montana, known as "Cedar Park[1]" which is solely owned by Gatzke.

The parties admit this Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b).  This adversary proceeding involves core proceedings under 28 U.S.C. § 157(b)(2).  This Memorandum of Decision includes the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052 (applying Fed. R. Civ. P. 52 in adversary proceedings).

A Pretrial Order approved by the parties' counsel was submitted, and was entered by the Court on October 30, 2006, superseding the pleadings and governing trial of this cause.  Trial commenced after due notice at Missoula on November 2, 2006, and concluded on November 6,

---

[1]A complete metes and bounds description for Cedar Park is found at Ex. 32, p. 2, and Ex. 49, at pages 6 and 7 of Schedule C, which is incorporated by reference as though set forth in full herein.  An abbreviated description for Cedar Park is:  Tract 1 of Certificate of Survey No. 15526, lying in the NW1/4 of the NE 1/4 and in government Lot 2 of Section 17, Township 30 North, Range 20 West, P.M.M., Flathead County, Montana.

2006[2]. Gatzke appeared and testified, represented by attorneys Duncan Scott ("Scott") and

Angela LeDuc of Scott & Kalvig, PC, of Kalispell, Montana. Defendants were represented by

Edward A. Murphy ("Murphy") of Missoula, Montana, and Christian testified. Also testifying

were Gatzke's bookkeeper Judy A. Pendleton ("Pendleton"), and civil engineer Robert William

Stauffer ("Stauffer") of Schwarz Engineering, Inc., d/b/a Schwarz Architecture & Engineering

("Schwarz Engineering"). Plaintiff's exhibits ("Ex.") 1- through[3] - 59, and Defendants'[4] Ex. A[5],

B, C, D, E, F, G, H, I, J, and K, all were admitted into evidence[6]. At the conclusion of the

parties' cases-in-chief the Court granted the parties time to file simultaneous briefs, which have

been reviewed by the Court along with the extensive transcript and record, and applicable law.

These matters are ready for decision.

## PROCEDURAL HISTORY

Gatzke filed a Chapter 11 bankruptcy petition on February 6, 2006, with Schedules and

---

[2]By Stipulated Order entered on November 2, 2006, (Docket No. 41) Defendant Rocky Mountain Lumber, L.L.C., withdrew its Proofs of Claim filed in Gatzke's Chapter 11 case No. 06-60037-11, and Plaintiff's complaint against Rocky Mountain Lumber was dismissed with prejudice.

[3]The transcript of Adversary No. 06-00042 was admitted as Ex. 38 by stipulation of counsel, together with all exhibits admitted into evidence therein. The memorandum of decision in 06-00042 (Docket No. 32) was entered, with a judgment (Docket No. 34), on February 8, 2007. No timely appeal has been taken in Adv. No. 06-00042, and that judgment is final.

[4]By Order entered November 8, 2006 (Docket No. 42), the Court granted Plaintiff's motion to strike in part and did not allow the Defendants to offer any exhibits that had not been produced during discovery by October 30, 2006.

[5]Murphy stated that Ex. A is the same as Ex. 1. Tr., p. 52.

[6]The only exhibit to which an objection was raised was Ex. 56, a weather report. The objection was overruled and Ex. 56 was admitted, although the Court doubted its probative weight because of its remoteness from the Harmony Court subdivision.

Statements listing interests in real property with a total value in the amount of $7,410,000.00, and personal property with a total value in the amount of $458,243.38.  Schedule D lists secured claims totaling $2,737,258.59, including Christian's claim against real property secured by a lis pendens on Harmony Court[7], a subdivision located in Flathead County, Montana, listed as contingent, disputed, and unliquidated although stated in the amount of $72,150.

On March 31, 2006, Christian filed Proof of Claim No. 10 on his own behalf, asserting an unsecured claim in the amount of $1,101,599.37 for services performed and expenses incurred by Christian, including the value of equipment repossessed by the Debtor and expenses to replace it, and $600,000 for Christian's percentage of profit from the Harmony Court development. Christian also filed on March 31, 2006, an unsigned Proof of Claim No. 11 for Northstar Development asserting a secured claim in the amount of $176,247.40 for services performed on several Harmony Court lots, with copies of construction liens attached.  Gatzke filed objections to both Proofs of Claims, and those objections were consolidated for trial with the instant adversary proceeding.

Gatzke moved for and was granted authority in his Chapter 11 case to sell several Harmony Court lots, including lots encumbered by construction liens and lis pendens filed by Christian.  Christian's and Northstar Development's construction liens have since been adjudged null and void by final judgment entered in Adv. No. 06/00043, and partial summary judgment entered in the instant adversary proceeding by Memorandum of Decision (Docket No. 28)

---

[7]Ownership of Harmony Court was adjudged in Gatzke's name in Adv. No. 06-00043 by Memorandum of Decision (Docket No. 20).  A Judgment (Docket No. 21) was entered against Christian and his Northstar entities on June 5, 2006, declaring their construction liens and lis pendens filed against Harmony Court were null and void.  No appeal was taken by Defendants from that Judgment, and it is final.

entered on October 24, 2006, and Judgment (Docket No. 55) entered on December 15, 2006. The proceeds from the sale of Harmony Court lots have been released to Gatzke to be administered in his Chapter 11 Plan of reorganization.

Gatzke's Second Amended Chapter 11 Plan was confirmed, without objection, by Order entered on June 22, 2006. On September 9, 2006, Gatzke moved to modify his confirmed Plan in order to allow the Debtor to finance completion of his Cedar Pointe[8] real estate development instead of selling it in its entirety. Objections were filed, but after a hearing the Court granted Debtor's motion to confirm Gatzke's Second Amended Plan as Modified on October 5, 2006.

Gatzke filed his complaint in the instant adversary proceeding on May 5, 2006. After summary judgment was granted, the following claims remain in this adversary proceeding, as provided in the Pretrial Order: (1) Gatzke's claims for relief based on breach of contract; (2) negligence; (3) a demand for an accounting of expenses and invoices related to Harmony Court in order to determine any profits pursuant to the parties' agreement; (4) Gatzke's objections to Proofs of Claims Nos. 10 and 11; and (5) Christian's request for a determination of his or his entity's interest in Cedar Park. Christian's entity for purposes of item 5 is Northstar Properties.

## STIPULATED FACTS

The following stipulated facts are set forth in the Pretrial Order:

### A. **Harmony Court**

_____1. Pursuant to this Court's Adversary Proceeding No. 06-00043 (Lots 11A and 11B), and October 24, 2006, Memorandum of Decision and Order in this matter, this Court has invalidated Christian's liens recorded January 10, 2005, on Harmony Court Lots 1A, 1B, 4A, 5A, 5B, 6A,

---

[8]Cedar Pointe is the same development as Cedar Park.

6B, 7A, 7B, 8A, 8B, 9A, 9B, 10A, 10B, 11A, 11B, 12A, 12B, 13A, 13B, 14A, 14B, and 16A, and Christian's Lien recorded June 20, 2005, on Harmony Court Lots 1A, 1B, 4A, 4B, 5A, 5B, 6A, 6B, 7A, 7B, 8A, 8B, 9A, 9B, 10A, 10B, 11A, 11B, 12A, 12B, 13A, 13B, 14A, 14B, and 16A.

2. Christian has no right to the $208,965.00 held in escrow as a result of Christian's liens and Gatzke is entitled to his reasonable attorney's fees and costs pursuant to both his Contract for Deed with Christian and § 71-3-124, MCA. *See*, Order dated October 24, 2006, in Adversary No. 06-00056.

3. Jim Christian was a resident of Flathead County at all material times.

4. Northstar Development of Montana, L.L.C., Bearcat Drilling and Pump Company, L.L.C., and Northstar Properties, L.L.C., which are all Montana limited liability companies, and GlacierCrossroads, a Corporation, a Montana corporation, have all been involuntarily dissolved (Jim Christian and his entities are collectively referred to as ("Christian").

5. Jim Christian was either the sole member or shareholder of the above-listed Christian entities, and acted as the agent of these entities.

6. In approximately February 2001, Christian approached Gatzke and/or the Donald A. Gatzke Trust (collectively referred to as "Gatzke") about purchasing and developing approximately 5 acres of real property located near Harmony Road and Solberg Drive in Kalispell, Montana.  They agreed that Gatzke would purchase the property and finance the project.

7. Gatzke provided Christian with $2,500.00, of which Christian used $2,000.00 for earnest money to secure a buy/sell on land that is now part of Harmony Court, and kept the rest.

6

8.   The parties agreed to split the net profits on Harmony Court, 1/3 to Gatzke and 2/3 to Christian.

9.   Christian was to obtain subdivision approval.

10.   "Christian's work on infrastructure for Harmony Court was awarded to him by Gatzke only after submitting a bid which Gatzke accepted."  *See*, Adv. Proc. No. 06-00043 at p. 31.

11.   On or about June 5, 2001, Gatzke paid the purchase price and acquired fee title to some of the property that became known as Harmony Court (Lots 21 and 22 of Hoiland Day Acres), and on or about March 8, 2004, Gatzke paid the purchase price and acquired fee title to the balance of the property that became known as Harmony Court (Lot 22C and Lot 23D of Hoiland Day Acres).

12.   On October 15, 2002, Gatzke and Christian signed a document entitled "Contract for Deed" ("Christian Contract") [admitted into evidence as Ex. 13/Ex. D].

13.   The Christian Contract is a joint venture agreement for the sharing of profits, not a "real estate improvement contract" as defined at § 71-3-522(5), MCA.  *See*, Adv. No. 06-00043 Memorandum of Decision at p. 40.

14.   The Christian Contract was never recorded and thus conveyed to Christian no record title to Lots 11A and 11B.  *See*, Adv. No. 06-00043 Decision at p. 31.

15.   Christian never received a Warranty Deed for any Harmony Court lot.

16.   Christian began work on the infrastructure in late November or early December of 2003.

17.   The subdivision plat for Harmony Court dated February 15, 2004, shows Gatzke as

the record owner of Harmony Court.

18.  On or about March 25, 2004, Gatzke entered into a Contract for Deed with Keystone Contractors, Inc., ("Keystone"), whereby Keystone would purchase Harmony Court for $1,120,000.00.  The purchase price was to be paid in installments of $30,000.00 per lot for the first ten lots, $35,000.00 per lot for the second ten lots, and $40,000.00 per lot for the remaining lots.  The debt would accrue interest at 6% with a balloon in two years from November 18, 2003, which was the date Keystone and Gatzke executed the Agreement Between Developer and Contractor.

19.  Keystone arrived on site to begin construction in April, 2004; the infrastructure was not complete at that time.

20.  As Keystone developed and sold lots in Harmony Court, Gatzke would execute a Warranty Deed for the particular lot to Keystone, who would then convey it to the purchaser.

21.  Ultimately, Keystone had financial difficulties, left the Harmony Court project in January of 2005, and filed for bankruptcy.

22.  Gatzke decided to proceed with completing Harmony Court on his own.

23.  On January 14, 2005, Keystone recorded a quitclaim deed transferring its interest in the remaining lots to the Gatzke Trust.  On April 29, 2005, Richard and Amy Ockey recorded a quitclaim deed transferring their interest in the remaining lots to the Trust.

24.  On or about February 3, 2006, the Trust transferred all its interest in the land known as Harmony Court, and all its contracts, claims, and choses in action, to Gatzke.

25.  On March 13, 2006, this Court entered an Order allowing the sale of the remaining Harmony Court lots (except Lots 11A and 11B) free and clear of all liens.  Pursuant to the March

8

13, 2006, Order, the proceeds were applied first to pay sale costs, then the net proceeds were used to pay First State Bank.

26. Gatzke sold the following lots after the March 13, 2006, Order:

a. On or about April 17, 2006, Lot 4A sold for $144,900.00;

b. On or about April 17, 2006, Lot 6B sold for $151,400.00;

c. On or about April 18, 2006, Lot 6A sold for $148,400.00;

d. On or about April 21, 2006, Lot 5B sold for $48,900.00;

e. On or about April 28, 2006, Lots 1A, 1B, 8A, 8B, 12A, 12B, 13A, 13B, 14A and 14B sold for $422,000.00;

f. On or about April 28, 2006, Lot 4B sold for $144,900.00;

g. On or about May 12, 2006, Lots 9A, 9B, 10A, and 10B sold for $170,000.00.

Once closing costs were paid, and hold-backs placed in escrow, the net sale proceeds from all these closings were paid to First State Bank of Thompson Falls.

27. As of October 26, 2006, Alliance Title & Escrow Corp. ("Alliance Title"), the title company that handled all the Harmony Court lot closings, is holding one and one-half times the amounts of the liens filed by Jim Christian/Northstar Development on the Harmony Court lots sold after January 10, 2005. Alliance Title has a total of $208,965.00 in hold-backs based solely on Christian's construction liens, which Gatzke is now entitled to receive pursuant to this Court's October 24, 2006, Order.

28. Alliance Title also has $48,682.28 in escrow, which are excess proceeds resulting from the Harmony Court lot sales.

9

29.  No partnership exists between Gatzke and Christian on Harmony Court.  *See*, Adv. No. 06-00043 Memorandum of Decision at p. 34.

30.  The parties were engaged in a joint venture for profit on Harmony Court.  *See, Id.* at pp. 38-39.

### B.  Cedar Park

31.  Christian first spoke to Gatzke in February 2004 about Cedar Park.

32.  On or about February 12, 2004, Christian and Gatzke executed a Buy-Sell Agreement on Cedar Park whereby Christian agreed to sell Gatzke the property for $325,000.00.  Ex. 30.

33.  On or about February 13, 2004, Gatzke closed at Citizen's Title and Escrow Company.  Gatzke paid $325,000.00 to the Irving Shaeffer Trust, who conveyed title to Gatzke.

34.  On August 3, 2005, Christian recorded a Lis Pendens on Cedar Park, the Lis Pendens was recorded in the Office of the Flathead County Clerk and Recorder as Document No. 20052151575.

35.  On or about February 3, 2006, the Trust transferred all of its interest in Cedar Park, and all its contracts, claims and choses in action, to Gatzke.

### ADDITIONAL FINDINGS OF FACT

The additional facts which follow are taken from the witness testimony and exhibits as set forth below[9], as well as facts which were judicially established in Adversary Proceeding Nos. 06-00043 and 06-00042, as set forth in the memoranda of decision entered in those cases with judgments, both of which are final judgments.

---

[9]While there are a few minor factual discrepancies between the testimony and the stipulated and judicially established facts, they are immaterial.

Gatzke is a licensed therapist with a PhD in higher and adult education and psychology, mediator, college administrator, and in addition since 1967 Gatzke has been engaged in real estate development, including development of the Harmony Court subdivision located in Flathead County, Montana, undertaken as a joint venture with Christian who originally acquired the property. Christian works in real estate development, and as a water well driller, which is how he first came into contact with Gatzke, who was looking for a water well driller and testified that he hired Christian to drill several wells for him. Gatzke testified that Christian told him about some difficulties he had, and Gatzke decided to help Christian with his finances because he testified he has a committed desire and history of helping people. Gatzke helped Christian finance several projects, many of which are described in varying detail below, and they leased and purchased equipment[10] for use in developing Harmony Court.

In Adv. No. 06-00043, Gatzke explained that he always insists on having sole ownership in property in which he invests as a means of control, and he insists on having bills and invoices related to properties submitted to him in order to write all checks for payments related to development of such property, to retain sole control. Memorandum of Decision, pp. 7, 10. But Christian thwarted Gatzke's controls.

## A. __Church Property__

One property Gatzke helped Christian acquire was referred to in testimony as the "church property". Ex. 6 is a check in the amount of $10,000 signed by Gatzke for the Gatzke Trust dated 11-30-03 to Northstar Properties with the memo "Bus Loan – Church earnest ... Collateral for Loan Harmony Project." Christian testified that the check constituted earnest money for him

---

[10]The equipment is the subject of Adv. No. 06-00042.

11

to purchase the church property located about 2000 feet south of the Harmony Court subdivision in Evergreen, but that Gatzke did not want to go through with it after John Schwartz convinced him it was not a good deal.  Tr., pp. 144-145, 164-165.  Christian testified that his first attempt to purchase the church property fell through and the $10,000 earnest money payment was lost, but then he did a new buy/sell with the church.  Tr., pp. 164-165.  The $10,000 from Ex. 6 was paid by Gatzke to Northstar Properties, and Christian testified that he believes the $10,000 was to be included in determining his share of the Harmony Court profit, so Christian could use the $10,000 as he saw fit.  Tr., p. 148.  Christian testified that he agrees he owes Gatzke that $10,000.  Tr., p. 166.

Ex. 50 is the second contract for deed to purchase the church property signed by Christian for Northstar Properties dated February 12, 2004, the day before the scheduled closing on the Cedar Park property.  Tr., pp. 154, 155, 161.  Christian testified that he made payments totaling $69,450 on the church property, until Gatzke filed a lis pendens against the property and Christian defaulted on the payment due on August 10, 2005, because he could not refinance with a lis pendens in place.  Tr., pp. 150-152, 486-487; Ex. 50, p. 12.  Ex. 58 is a copy of a notice of lis pendens describing the church property that was not filed until November 7, 2005, in the Montana Eleventh Judicial District Court, Flathead County, in Cause No. DV-05-547C, and was not recorded until November 7, 2005, with the Flathead County Clerk and Recorder, as Doc. No. 20053111530, involving Gatzke and Christian,.  Tr., p. 488.  Christian also admitted failing to make the payment due to the church on November 10, 2005.  Tr., p. 487; Ex. 50, p. 12.

Gatzke's general ledger in Ex. 2, at page 5[11], listing payments to Northstar Properties for infrastructure, lists payments to Northstar Properties from 12/27/2003 ($24,000.00) to 2/7/04 ($9,000.00) totaling $144,000.  Christian testified that he has not undertaken the effort to verify receipt of those monies from Gatzke, but he admitted that it is possible he received that $144,000.  Tr., p. 168.  But Christian denied using that $144,000 to pay the $69,450 for the church property, testifying that he got the $69,450 from his operation as Northstar Development and Bear Cat Drilling, drilling wells and doing dirt work at Harmony Court.  Tr., p. 169.

Christian signed a quit claim deed conveying the church property back to the church on February 13, 2004.  Ex. 50, pp. 16, 17.  That quit claim deed was recorded on May 8, 2006.  Ex. 50, p. 16.  Christian testified that he lost at least $60,000 on the church property from cash and improvements he made.  Tr., p. 489.

**B.  Cedar Park**

Christian entered into a buy-sell to purchase Cedar Park[12] on April 29, 2003, from Irving Schaffer for $333,000.  Ex. 29; Tr., p. 479.  He testified that he found out about the property two days earlier.  Ex. 29 provides for payment of $8,000 in earnest money, but Christian testified that he did not give Schaffer a check, but rather was to contribute consulting services to get the

---

[11]The page numbering for the general ledger is confusing, because the general ledger does not begin until about the tenth page of Ex. 2, after Gatzke's profit and loss statement, balance sheet and accounts.  The general ledger's page "2" begins the numbering on the eleventh page.

[12]The legal description of Cedar Park varies between exhibits.  Ex. 29, 30, and 41 all have different descriptions of the tract.  The common thread appears to be Tract 1 in the N.W. 1/4 of the N.E. 1/4 and in Government Lot 2 of Section 17, Township 30 N., Range 20 W., P.M.M., Flathead County, Montana, COS 15526 (assessor number 0660550).  The most detailed legal description in the record of Cedar Park is at Schedule C of Ex. 49, pp. 6-7.

"PUD[13]" approved.  Tr., pp. 33-34; 479.  Ex. 29 also provides that the buyer's offer was subject to acceptance by May 1, 2003.  Closing was to occur no later than November 3, 2003.  Ex. 29. On October 4, 2003, Schaffer and Christian signed an addendum extending the closing date to February 15, 2004, because they could not clear title to Cedar Park.  Ex. I; Tr., p. 482-483.

Searching for financing, Christian testified he contacted Steve Bryan of Questa Mortgage ("Questa") about financing his purchase of Cedar Park.  Tr., p. 64.  Ex. G to Ex. 35 is a letter from Lee E. Burrington of Questa to Julie Plevel ("Plevel") of RE/MAX, who was the sellers' broker, dated May 29, 2003, advising of a possible loan commitment from Questa to Northstar Properties for purchase and development.  Tr., p. 65.  Questa's office manager and loan originator Steve Bryan ("Bryan") testified at his deposition that Ex. G of Ex. 35 depended upon the information provided by Christian's information being accurate, and that Questa was not satisfied when it sent the letter that the contingencies had been satisfied, and they never were satisfied.  Ex. 35, pp. 24, 25.  Bryan agreed that Ex. G of Ex. 35 was not really a commitment letter, but rather was "sort of a commitment with contingencies".  Ex. 35, p. 24.  Christian at that time did not intend to talk to Gatzke about becoming involved with Cedar Park.  Tr., p. 66.

Ex. 42 is a letter from Plevel to Citizen's Title dated May 30, 2003.  Christian testified that Citizen's Title was going to be the closing company for his purchase of Cedar Park.  Tr., p. 67.  Ex. H to Ex. 35 is Questa's response to Plevel dated June 4, 2003, confirming that Questa would make the loan, Christian testified.  Tr., p. 68.  Questa's response in Ex. H of Ex. 35 refers back to the prior letter, Ex. G, and Bryan testified that Questa still had not verified the accuracy

---

[13]He never explained what "PUD" means.  From Ex. 29, page 1, it appears related to a preliminary plat approval.  The Court, based on general real estate development terminology, concludes  that "PUD" means "plan unit development."

14

of Christian's information.  Ex. 35, p. 26.

Christian testified that Questa is a "hard money lender," which does not use its own money for loans, but brokers loans from investors.  Tr., pp. 68, 79.  Ex. 49 is an unsigned draft of a mortgage note and mortgage dated December 2003, prepared by Questa for Northstar Properties and naming the prospective lender as Lyle Gillard[14], who Christian testified was a prospective investor/lender through Questa.  Tr., p. 72.  Gatzke testified that he told Christian about Clara and Lyle Gillard as possible sources of financing, but that Gatzke did not have any money that was not tied up.  Tr., pp. 299, 300.  Gatzke testified that he did not hear from Christian again about Cedar Park until about February 9, 2004.  Tr., p. 300.

Christian responded "Yes" when asked whether Questa had committed to loaning him money for Cedar Park as of May 2003.  Tr., p. 69.  However, as set forth above Questa's loan commitment in Ex. G to Ex. 35 was based upon certain financial information, appraisals, etc., being accurate.  Christian testified that the seller developed title problems, and the financing never materialized from Questa.  Tr., pp. 72.  Questa's Bryan testified that he did not think that Christian was ever going to be the real buyer, and that Questa's "loan" to Christian would not have closed unless Gatzke or someone else with a net worth was going to sign the loan documents, and provide financial statements and tax returns.  Ex. 35, p. 29.

Ex. I to Ex. 35 is a balance sheet prepared by Christian or his wife on his own computer listing his assets and liabilities as of January 12, 2004, in the total amount of $5,401,000 and total liabilities in the amount of $2,146,000, a net worth of $3,255,000.  Tr., pp. 74-75.  Christian

---

[14]Gillard may have been from the business known as Culligan, but Christian was not certain.  Tr., pp. 71-72.

testified that it was accurate as of January 12, 2004.  Tr., p. 75.  Ex. I to Ex. 35 includes as an

asset the Harmony Court subdivision at a value of $1,190,000.  Christian testified that he based

that figure on his contract with Keystone, although he admitted that Harmony Court was titled in

Gatzke's name.  Tr., p. 76.  Ex. I to Ex. 35 also includes Cedar Park subdivision at a value of

$1,800,000, although his purchase had not closed.  Tr., pp. 76-77.  But Christian testified that he

had a signed buy-sell, the seller had extended the closing date, and he had obtained approval of a

PUD from Columbia Falls City Council.  Tr., p. 77.  Ex. J to Ex. 35 is Christian's credit report

from Equifax dated January 29, 2004, which lists eleven judgments and liens against Christian.

Tr., p. 78.

Christian testified that he involved John Schwarz's company, Schwarz Engineering, to

perform engineering and construction work on Cedar Park from the date he signed the buy-sell,

but that after initial approval was turned down by the city planning board Schwarz Engineering

dropped out and Christian hired another person named Mark Lecty and got approval from the city

council in 2003, before he transferred the property to Gatzke.  Tr., p. 479.  Christian testified that

he got Cedar Park approved for 79 lots as a PUD, and that Gatzke has received the benefit of his

work.  Tr., p. 480.

Stauffer has been a civil engineer since 1979, and has been employed by Schwarz

Engineering since 1998 working on subdivisions in the Kalispell area, on floodplain studies and

on design of septic systems and water systems.  Tr., pp. 218-219.  Schwarz Engineering provides

engineering and design services for clients who wish to develop property, from preliminary

planning and plat approval phases to construction of the final plat, and Stauffer's involvement is

usually in design and construction.  Tr., p. 219.  Schwarz monitors construction progress,

provides staking to align sewer and water systems, and provides companion testing and generally monitors projects and answers contractors' questions. Tr., p. 219.

Ex. 3 is Schwarz Engineering's invoice sent to Christian, dated 11/20/2003, in the amount of $17,054.00 for work on Cedar Park, the church property, and other projects not including Harmony Court. Ex. E includes a total of $14,163.50 incurred on Cedar Park, which Christian testified was for work done by Schwarz Engineering to bring about approval of the PUD. Tr., pp. 201-202. Christian testified that Ex. 3 is for work performed at several properties including Cedar Park, the church property, Deerpark and Altender. Tr., p. 478. Christian admitted that Gatzke paid a portion of the Schwarz Engineering's bill for the Cedar Park work. Page 2 of Ex. 3 is a check from the Gatzke Trust to Schwarz Construction, Inc., signed by Gatzke and dated 3/9/05, in the amount of $41,835.45 and a handwritten memo: "Cedar Pointe". Christian testified that he "didn't pay all" of the $14,163.50 for Cedar Park work charged by Schwarz Engineering because John Schwarz approached Gatzke for payment instead, but Christian claims that he paid $5,000 of Ex. 3, which showed $11,641.00 more than 60 days past due. Tr., p. 202.

Ex. K to Ex. 35 is a preliminary appraisal for Cedar Park prepared by Scott Ingersoll at Christian's request, showing a value to Cedar Park of $520,000 to $575,000. Tr., p. 80. Christian testified that Questa suggested to him that it purchase Cedar Park and sell it to other investors, but Christian told him he would not agree[15]. Tr., pp. 82, 84. Ex. N to Ex. 35 is an unsigned agreement prepared by Questa for its purchase of Cedar Park from Northstar Properties

---

[15]Upon Christian's refusal to sign the agreement, he testified that Questa's owner Burrington immediately crossed out the signature of an investor which was on the agreement. Tr., pp. 82-83.

17

for the sum of $324,432.88, dated February 6, 2004.  Tr., p. 83.  At the time of Questa's proposal that it purchase Cedar Park from Northstar Properties, Christian testified that the closing on his purchase of Cedar Park was scheduled for early to mid-February 2004.  Tr., p. 84.  Questa made other proposals before the closing, but Christian decided to have Gatzke finance his purchase of Cedar Park instead.  Tr., pp. 86, 87.

Christian approached Gatzke again about Cedar Park, requesting that he provide financing a couple of days before the closing of Christian's purchase, which was scheduled to take place at Citizen's Title.  Tr., pp. 70, 300.  Christian testified that he told Gatzke, about February 9 or 10, 2004, while discussing other projects[16], that he had the Cedar Park project approved and asked if he was interested, and that Gatzke said yes.  Tr., pp. 87-88.  This answer is inconsistent with Christian's sworn testimony in state court proceedings:  "I don't know how Don even found out about Cedar Park."  Ex. 37, p. 130.

Christian explained that he had dealt with Gatzke on several other projects based "on a handshake" which had worked out so far, and he decided to talk to Gatzke even though Questa "was surefire" to provide Christian financing.  Tr., pp. 88-89, 160.  Explaining his decision Christian testified:  "Because instead of having to deal with one creditor, we were dealing with one individual who knew our total picture, who knew how much we owed where and knew our past history, *knew that we always made good on the loans*."  Tr., p. 160 (emphasis added).

Christian testified that he proposed to Gatzke that if he would finance Christian's purchase of Cedar Park they would do the same arrangement as Harmony Court and split the profits.  Tr., pp. 89, 92.  In state court proceedings held on August 19, 2005, Christian testified

---

[16]The "other projects" included Harmony Court.  Tr., p. 90.

18

that Gatzke "was pushing" into the Cedar Park project after learning what Christian paid and its potential, and Christian was afraid that Gatzke would use his leverage against Christian for other payments owed.  Tr., p. 158; Ex. 37, pp. 130-132.

Gatzke testified that Christian came to his house on Monday, February 9, 2004, needing to have financing in place to purchase Cedar Park by that Friday.  Tr., p. 301.  He testified that Christian showed him the appraisal valuing Cedar Park at $600,000 and told him the price was $325,000, and Gatzke told him that any bank would lend money at that ratio, but Christian said that was not an option.  Tr., pp. 301-302.  Christian testified that he felt he should get credit for $500,000 in work he had provided in getting preliminary approval, but that Gatzke did not want to give him credit and wanted in to Cedar Park at a different distribution of profits or Gatzke would finish everything up between them.  Tr., pp. 89-90, 159.  Gatzke testified that Christian offered to put together a deal like Harmony Court, and one scenario Christian offered was for Gatzke to buy Cedar Park for $825,000 because Christian wanted $500,000 for the improvements he had already made.  Tr., p. 302.  Gatzke testified that he declined that offer, and also declined Christian's offer that they enter into a two-third/one-third profit split like they did for Harmony Court.  Tr., pp. 302-303.

Gatzke testified that he told Christian at the February 9, 2004, meeting that if he bought Cedar Park he would have a professional, not Christian, do the infrastructure, but that Gatzke would be willing to request that the contractor involve Christian as much as possible, although he made no promises.  Tr., pp. 303-304, 308.  At that time, Gatzke testified, he was becoming anxious because he was under the impression that the deadline for Christian to complete the infrastructure at Harmony Court was March 1, 2004, and Gatzke did not see that work

19

progressing.  Tr., p. 304.

Christian denied that Gatzke told him that Gatzke wanted no relationship on Cedar Park similar to their Harmony Court relationship.  Tr., p. 90.  Gatzke testified that Christian was going to lose the deal by Friday if he did not close with Schaffer, and rather than absolutely lose it Christian agreed to sign the sale over to Gatzke in the hope of getting something for his efforts, which Gatzke described as his recommendation that whoever Gatzke hired to complete the infrastructure would give Christian as much work as they felt he was able to do.  Tr., pp. 308, 31.

Christian testified that because of his long relationship with Gatzke and his leverage over Christian, ultimately Christian elected to deal with Gatzke, although Christian testified that Questa remained an option for financing.  Tr., p. 160.  Christian admitted that he has no documents which reflect an agreement with Gatzke to share profits on Cedar Park by a two-thirds/one-third split.  Tr., p. 92.  But Christian later testified that they talked about how they would share profits similar to Harmony, and he insists they had an understanding or Gatzke would not have proceeded to get financing for Cedar Park.  Tr., p. 482.

Christian explained that "what has always driven me to get into the dirt agreement is to create my own subdivisions and create my own workload for myself; not others."  Tr., pp. 93, 108.  Christian testified that he would never go through the trouble of purchasing Cedar Park, obtaining PUD approval, and sell it to Gatzke for less than he paid for it just to settle for doing the infrastructure.  Tr., p. 93.  Christian wanted both a share of profits from Cedar Park and the infrastructure work, but he testified that Gatzke "told me things like he wasn't gonna have anything to do with me doing the infrastructure and he was gonna contract with Schwarz to do it, and I told him I didn't agree with that."  Ex. 37, p. 132.

Ex. 30 is a "Buy-Sell Agreement", signed by Christian for Northstar Properties, in which he sold Cedar Park to the Gatzke Trust for $325,000.  Tr., p. 96.  Christian testified that the purpose of Ex. 30 was not to sell Cedar Park to Gatzke, but rather the same as their other business deals – to put Gatzke on the title to obtain financing.  Tr., p. 95.  However, Ex. 30 plainly states near the top of page 1 that Christian "agrees to sell the following real property" to the Gatzke Trust, followed by the description of Cedar Park[17].  Gatzke testified that Christian brought Ex. 30 for him to sign and he signed it on behalf of the Gatzke Trust, and that Gatzke did not deal with the realtor or prepare Ex. 30.  Tr., p. 310.

Gatzke testified that he never agreed to split profits from Cedar Park with Christian.  Tr., p. 316.  Christian admitted that no provision exists in Ex. 30 which reflects Christian's alleged agreement that he and Gatzke would split the profits of Cedar Park two-thirds/one-third.  Page 6 of Ex. 30 includes the following paragraph:

> **ENTIRE AGREEMENT**: This Agreement, together with any attached exhibits and any addenda or amendments signed by the parties, shall constitute the entire agreement between Seller and Buyer, and supersedes any other written or oral agreements between Seller and Buyer.  This Agreement can be modified only in writing, signed by the Seller and Buyer.

Nothing in the record shows a modification of Ex. 30 signed by the parties.

Christian testified that he signed Ex. 30 just before he closed his own purchase of the Cedar Park property.  Tr., p. 94.  Christian closed on his purchase of Cedar Park at Citizen's Title after signing Ex. 30, on February 13, 2004, the day after he closed on the church property.  Tr., pp. 96, 154, 155.  Christian testified that he did not bring any cash to closing on Cedar Park.  Tr., p. 105.  Gatzke testified that he attended the closing and paid the buyer's side of the transaction,

---

[17]"Tract 1, COS 15526".  Ex. 30, p. 1

and that Christian did not pay him anything.  Tr., pp. 310-311.  Gatzke did not personally have the $325,000 needed to close on Cedar Park, so he went to a bank in Columbia Falls which offered to loan him two-thirds of the money if Gatzke would come up with $100,000 cash.  Tr., p. 309, 482.

Ex. 32 is the warranty deed transferring Cedar Park from the Irving Schaffer Trust to the Gatzke Trust, dated February 9, 2004.  Tr., p. 101.  Northstar Properties' name is crossed out on Ex. 32, with the initials "JP" above, and "Donald A. Gatzke Trust" is entered immediately to the right as buyer on Ex. 32.  Jackie Phillips testified that the initials "JP" are hers and she typed in the Gatzke Trust's name as buyer pursuant to Christian's authority and while he was present and approved it.  Tr., p. 103, Ex. 47, p. 13.

Christian denied telling Jackie Phillips to put the Gatzke Trust on Ex. 32 as the buyer. Tr., pp. 96, 98, 101.  He testified that he told her that Gatzke was going to close on Cedar Park so they could get financing, but that he does not remember telling her to alter the deed.  Tr., p. 98. Ex. 47 is Jackie Phillip's deposition dated October 30, 2006.  When asked what happened with Northstar Properties' closing she testified that Northstar Properties did not close, and explained:

> Jim Christian came into my office himself and indicated that Northstar Properties
> wasn't going to be the buyer but Donald Gatzke was going to be the buyer –
> Donald Gatzke trust.  And I said to Jim, I probably need to send this warranty
> deed back out to Mr. Schaffer, and he asked me not to do that.  He said as long as
> he was Northstar Properties and he said so, that we could deed it to Donald
> Gatzke because time was of the essence, and that Mr. Schaffer was an elderly man
> and that he would not understand, and Jim needed to get this closed as soon as
> possible.

Ex. 47, pp. 9-10; Tr., pp. 99-100.

Christian testified that he does not believe he told Phillips to alter the deed, and he argued

that it is immaterial because attorneys have advised him that changing the buyer's name is not legal.  Tr., pp. 100, 101, 103-104.  Christian testified that a deed of record in Flathead County Courthouse shows Northstar Properties as the owner of record of Cedar Park even though it has been altered without the seller Irving Schaffer's consent.  Tr., pp. 97, 98, 104.

Gatzke testified that he had paid Schwarz Engineering's bills for engineering work done on Cedar Park which Christian owed.  Tr., p. 311.  Although Christian admitted that Gatzke paid Schwartz a portion of its bill for Cedar Park, he testified that he could have paid Schwarz from the Questa loan that fell through, or from Christian's other work.  Tr., p. 106.

Gatzke testified that he intended to continue having Schwarz do the engineering for Cedar Park, and to hire a contractor to do infrastructure who would try to get Christian work with the contractor.  Tr., p. 311.  Gatzke testified that Christian asked him for a separate agreement on Cedar Park, but Gatzke was unwilling because he was hiring a different contractor and did not know what that contractor would be willing to hire Christian to do.  Tr., pp. 311-312.  Gatzke decided to hire Schwarz Construction, Inc. ("Schwarz Construction") to do the infrastructure work on Cedar Park, and testified that owner John Schwarz was willing to give Christian some landscaping and brush removal[18], but nothing of a technical nature.  Tr., pp. 313.  Gatzke tried to get Christian to contact John Schwarz, and vice versa, for ten days and then Gatzke signed his contract with Schwarz Construction to do the Cedar Park infrastructure.  He testified that Christian delayed contacting Schwarz and would not return Schwarz's phone calls.  Tr., pp. 314, 315.

_____

[18]Gatzke testified that John Schwarz was willing to give Christian work worth from $350,000 to $450,000.  Tr., p. 313.  But Schwarz would require Christian carry workers' compensation, insurance and licensing requirements.  Tr., p. 313

Gatzke testified that Christian called him in December 2004 and was very upset that he was not getting to do the infrastructure at Cedar Park. Tr., p. 316. The fact that Gatzke hired Schwartz to perform the infrastructure on Cedar Park, instead of Christian, is what brought about the fall of his relationship with Gatzke, Christian testified, because Gatzke wasn't going to give Christian any say in developing Cedar Park. Tr., pp. 107, 108; Ex. 37, p. 132. Christian testified that he wrote Gatzke a letter asking for an accounting of Harmony Court and their other joint projects, and that he filed a lawsuit in state district court in July 2005 when Gatzke would not provide an accounting. Tr., p. 107; Ex. 37, p. 132.

Christian testified that if Gatzke succeeds in getting ownership and control of Cedar Park then Christian will have lost money for his efforts in gaining approval of the Cedar Park project. Tr., pp. 481-482.

### C.  Harmony Court Development – History & Infrastructure

Gatzke and Christian first began to discuss developing Harmony Court in 2001, when it was originally contemplated as a small trailer court. Tr., p. 415. Christian admits that Gatzke paid for most or all of the consideration for the purchase of Harmony Court.

Gatzke and Christian entered into a written agreement to share profits from the Harmony Court development. This Court's Memorandum of Decision entered in Adv. No. 06-00043 on June 5, 2006 (Docket No. 20) sets forth the material facts regarding their agreement, and as a final decision has preclusive effect.

On October 15, 2002, Gatzke and Christian both signed a document entitled "Contract for Deed" (hereinafter "Ex. 13/D[19]") between Gatzke and Northstar Properties in which Gatzke

---

[19]Ex. 13/D was designated Ex. 10/E in Adv. No. 06-00043.

agrees to sell to Northstar Properties the Harmony Court subdivision.

Under "Price and Terms" the Ex. 13/D provides:

Purchaser covenants and agrees to pay to Seller such sum as the parties have calculated for the initial costs of a project known to them as Harmony Court, (the "ACCOUNTING" which is ATTACHED HERETO[20]), plus such additional costs as may accrue, plus the sharing of profits beyond the such "Accounting" amount to be paid to Seller, with Seller to receive 1/3rd of the profit and Buyer to receive 2/3rds of the profit associated with the sale of the real property known by the parties as Harmony Court. The "Accounting" if not attached hereto at the time this contract is signed, shall be attached no later than February 15, 2004. Purchaser agrees to do likewise by said date.

Since the "Accounting" amount to be paid to Seller by Buyer, before the sharing of profits takes place, will increase over time, the original "Accounting" attached hereto will be modified by one or more additional "Accounting" document(s), which will then be initialized and attached hereto.

As the parties attach a new "Accounting" they shall initialize it, whereupon the amount due as shown by the "Accounting" will be deemed conclusive and binding on each party; so if any dispute arises concerning the amount to be paid to Seller, before the sharing of profits takes place, the dispute will only involve the expenses and costs and amount claimed due or claimed not due subsequent to the last "Accounting" document bearing the parties['] initials, which is attached hereto.[21]

Gatzke testified that Christian's only interest in Harmony Court was a share in the net profit if a net profit arose upon or after sale. Christian testified that their agreement was that Gatzke would finance the project and they would split the profit two-thirds for Christian and one-third to Gatzke. Ex. 13/D provides that in the event of breach or default the defaulting party shall pay costs and reasonable attorney fees "reasonably incurred by the non-defaulting party because

---

[20]Neither Gatzke nor Christian included in Ex. 13/D the "ACCOUNTING".

[21]Notwithstanding that statement, no "Accounting" is attached, initialized or not, to Ex. 13/D.

25

of such default." Ex. 13/D[22].  Ex. 13/D was never amended in writing.

Christian testified that he and Gatzke never intended to build homes, but rather just intended to develop vacant lots with infrastructure and sell them.  Tr., p. 484, 485.  He testified that Gatzke proposed selling the subdivision to the Ockeys from Keystone Contractors. Tr., p. 484.

Keystone signed a contract with the Gatzke Trust dated November 18, 2003, to purchase all of Harmony Court vacant lots, except Lots 11A and 11B, for $1,190,000.  Ex. 17; Tr., pp. 347, 411.  Keystone entered into a similar agreement with Northstar Properties, also dated November 18, 2003.  Tr., p. 412; Ex. 36 (Ex. B attached).  Gatzke was upset when he discovered Northstar Properties's agreement with Keystone.  Tr., p. 412-413.

Gatzke testified that Amy Ockey ("Amy") of Keystone had phoned him on the morning of November 18 and said she had bought the Harmony Court property, and Gatzke told her she could not have because he did not sell it to her.  Tr., pp. 448-449.  He testified that Amy replied that she had a contract with Christian to purchase Harmony Court, and Gatzke then told her that Christian did not own the land.  Tr., p. 449.  Gatzke testified that Amy contacted him again later and said that she realized that she had an invalid contract with Christian which had no value because Christian did not own the property, which she discovered was listed in the courthouse in Gatzke's name, and she asked Gatzke to contract with Keystone.  Tr., pp. 449.  Gatzke met with Ockeys' attorney and made a few changes in their contract, and then he signed it and signed a construction mortgage, Ex. G.  Tr., p. 449.

Ex. 17 provides at page 3 that Keystone would receive a $13,000 discount if it closes

_____

[22]Both parties were represented by the same attorney in drafting Ex. 13/D, p. 3.

construction loans on ten Harmony Court lots in the first six months.  Tr., p. 347.  Keystone intended to build townhouses and sell them.  Tr., p. 411.  Gatzke testified that Keystone ultimately paid him a total of only $600,000, which was not the agreed purchase price under Ex. 17.  Tr., p. 351.

Gatzke testified that he asked Christian to get three bids on the Harmony Court infrastructure, but Christian denied that.  Tr., pp. 110, 342.  Ex. 15 is a "proposal" from JTL dated 3-18-03, stating $86,250 for street construction and $125,870.00 for utilities, a total of $212,120.  Tr., pp. 111, 491.  Gatzke testified that he asked Christian for the other two bids but never received them.  Tr., p. 342.  Christian denied not giving Gatzke Ex. 15, and testified that he gave it to Gatzke's attorney.  Tr., pp. 490, 491  Christian testified that the bids he received did not include some of the work which would be required for the Harmony Court infrastructure such as swales, material removal, demolition, septic system removal, removal of concrete slabs and stumps, termination of utilities and surveying, and Christian did not receive a third bid he had requested in writing.  Tr., pp. 489-490, 492-493.  Christian testified that the bid he received from JTL was ten months old, and costs for labor and fuel would have changed.  Tr., p. 490

Ex. 14 is a document headed "Bid Totals" for doing the Harmony Court infrastructure from March 2003, including paving, which Gatzke testified was Christian's bid and added up to $230,000.  Tr., p. 339-340, 465.  Christian testified that Ex. 14 was just a worksheet from early 2003 and is not a bid from either him or JTL.  Tr., p. 466.  Christian agreed that the total of Ex. 14 is $230,755, but that Ex. 14 does not include a bond or address swales.  Tr., pp. 494-495.  Gatzke testified that Christian told him that Christian's bid, Ex. 14, matched the lowest of the three bids.  Tr., p. 342.  Christian denied that it matched the lowest bid.  Tr., p. 497.

27

Christian testified that he and Gatzke entered into an oral agreement for Christian to install the Harmony Court infrastructure for $230,000, including road, sewer, electrical conduit and vaults, gas ditch excavation, telephone conduit and ditch, and cable TV conduit.  Tr., pp. 113, 343.  Christian testified that they agreed to Christian's bid in December of 2003.  Tr., pp. 127-28; 496.  Christian testified that he probably did some general calculations before agreeing to $230,000, but was not that concerned because he looked at all the things he did on Harmony Court as costing him two-thirds of the amount spend on what he did.  Tr., p. 496.

Christian testified that he had a goal of finishing the infrastructure in 3 or 4 months, and as soon as possible, because he wanted Keystone to come in and start building houses.  Tr., p. 129.  Gatzke testified that he was under the impression that the infrastructure would be completed by March 1, 2004.  Tr., p. 305.  Later, however, Gatzke admitted that "we knew that we could not pave until later on anyway".  Tr., p. 344.

Gatzke testified that they anticipated that the infrastructure would require one month of rental of Caterpillar equipment.  Tr., p. 307.  That estimate turned out to be far short.  Amy Ockey of Keystone testified that Christian assured them with confidence that the infrastructure would be complete by March 1, 2004, and Keystone would be free to move in and build on Harmony Court, which Keystone had already begun to market in the fall of 2003.  Ex. 36, pp. 39, 40.

Gatzke then left for Kenya about December 20, 2003, and did not return until the third week of January 2004.  Tr., p. 305.  While Gatzke was gone, he testified that his wife filled out blank checks which he had signed before he left and gave the checks to Christian, which are part of the $144,000 in payments to Northstar Properties shown by the general ledger in Ex. 2, at page

28

5.  Tr., p. 305.  Gatzke testified that the payments made to Christian are based on what Christian told his wife he expended, but Christian did not provide her with invoices or any documents.  Tr., p. 306.

Christian testified that he had never before been responsible for installing sewer and water in a subdivision, and that Harmony Court was his first subdivision construction involving a public sewer system[23].  Tr., p. 114.  Christian testified that he has 15 or 20 years of dirt-moving experience connected with his well drilling background, but has never personally operated an excavator.  Tr., p. 115.  He testified he has excavated half a dozen holes for foundations and basements, including at Harmony Court.  Tr., p. 116.

Schwarz Engineering was not involved in the preliminary phase of Harmony Court, Stauffer testified, and he became involved in December of 2003 when construction started.  Tr., pp. 220, 281.  Stauffer's responsibilities at Harmony Court included monitoring construction, providing elevation control and temporary benchmarks[24] to install infrastructure to proper grades, providing alignment staking for water and sewer main, compaction testing on the roads, and testing the sewer and water after installation.  Tr., p. 220-221.  Stauffer testified that previously he had done a few small projects with Christian, including a simple family transfer of 3 lots and sanitary/septic work.  Tr., pp. 222-223.  Stauffer testified that Harmony Court was Christian's first job involving sewer and water.  Tr., p. 225.  Stauffer testified that he worked with Christian throughout the project, but that it was not Schwarz's responsibility to tell a contractor when or

---

[23]Christian has worked on septic systems.  Tr., p. 114.

[24]On cross examination Stauffer described how he installed two rebars as temporary benchmarks at Harmony Court.  Tr., pp. 277-278

how to do his job.  Tr., p. 272.  Stauffer testified that he was familiar with what needed to be
done to install infrastructure at Harmony Court, and that in good conditions it typically would
take a few months to complete the infrastructure on a job that size.  Tr., p. 221.  Stauffer testified
that the soil at Harmony Court was good material, except that it does not hold a trench and the
trench walls are "V" shaped instead of vertical.  Tr., p. 261.

Christian testified that he broke ground on the infrastructure installation sometime in
December 2003, but they immediately encountered about a foot of ground frost.  Tr., pp. 128-
129.  Stauffer testified that his notes indicate that Christian began installing infrastructure at
Harmony Court on December 15, 2003, and began stripping material to get the road to subgrade
elevation and preparing to put in water and sewer lines, and installing the water main on
December 18, 2003.  Tr., pp. 227, 240, 352.

Christian testified that he had a hard time dislodging the frost when he started moving
dirt.  Tr., p. 131.  He testified that they had to use several different pieces of equipment to break
the frost, and did not have a full crew on the job at all times until the middle or end of January
2004.  Tr., pp. 131-132.  Once the frost was removed, Christian testified, they had to move the
dirt they were working on that day or it would freeze solid.  Tr, p. 134.

Stauffer testified that it is important in wintertime with freezing conditions that you have
the proper equipment and crew, and to get pipe in the ground, bedded and backfilled in a timely
manner[25].  Tr., pp. 222, 248.  He testified that it is necessary to stay on the job and follow the
plans in order to complete the job on time and within budget.  Tr., p. 222.  Ex. 18 offered by

_____

[25]Ex. 55, page 3 photograph "S6" dated 1/28/04 shows a filled trench with insulating
blankets pulled back to prevent the trench from freezing.  Tr., p. 257.

Gatzke is a letter from professional engineer Andrew J. Hyde ("Hyde") of Carver Engineering, Inc., to the Evergreen Water & Sewer District dated December 15, 2003, commenting on cold weather construction concerns involving PVC pipe installation. Hyde concludes his comments: "Bottom line is that wintertime construction can be done if a contractor is aware of all the limitations and time constraints. A good contractor will be aware of those things, *but a good contractor probably won't be proposing to work in the winter anyway.*" Ex. 18, p. 1 (emphasis added). Stauffer testified that they "had a few days of cold weather that they couldn't work, but other than that, it was actually quite mild." Tr., pp. 221, 240, 252. Ex. 56 is a compilation of temperatures at the Glacier International Airport during December, January and February[26].

Christian testified that he hired a lot of temporary contract laborers[27] and had a lot of turnover because it was 30 degrees below zero a lot of the time and he found many of his laborers unreliable and "worthless". Tr., pp. 118, 119. Christian testified that he scheduled more laborers than he thought he would need because they did not last. Tr., p. 120. He paid his contract laborers by check. They were supervised primarily by Eric Sklany who was one of the more responsible laborers[28]. Tr., p. 122-123. Stauffer testified that none of Christian's crew was knowledgeable or experienced at installing water and sewer systems, to the point that Stauffer had to show the crew how to put joint, pipe and bell fittings together and wrap them. Tr., pp.

---

[26]The Court stated that Ex. 56 does not establish anything as to the weather conditions at Harmony Court six miles away. Tr., p. 238.

[27]Christian did not have workers' compensation on his contract laborers, and did not do withholdings. Tr., p. 119.

[28]Sklany also could operate equipment and owned his own dump truck, according to Christian. Tr., p. 123.

225-226, 240-241, 254-255; Ex. 56, p.2 photo "S4". Stauffer testified that Christian's employees had such high turnover that he had almost a totally different crew by March of 2004. Tr., p. 241.

Christian testified that he was on the project from the time the laborers arrived until they left, so he was the primary supervisor. Tr., p. 124. He testified that Stauffer would come to the job site and approve installation of fire hydrants and manholes, and to make sure the work was performed according to engineering standards. Tr., pp. 125, 126-127. Stauffer testified that he had to show the crew how to do their own work instead of just monitoring and providing staking. Tr., p. 226. Stauffer testified that Christian acted as the superintendent to keep crew and materials on site and oversaw the operation, and as such Christian was responsible for making sure that the installation was done properly by the deadline. Tr., pp. 226-227.

Much of the ditch work was manual work in the ditches with pipe and shovels. Tr., p. 121. Stauffer testified that the work on the main water main was completed in about a week, and about on schedule. Tr., p. 242.

Christian testified about the specific grade required for sewer slope and compaction issues. Tr., p. 121. He testified that the sewer grade had to be at a .02 percent slope. Tr., pp. 126-127. Stauffer testified that Schwarz Engineering discovered during a periodic grade check that the sewer main from Solberg was too low and at the wrong elevation after Christian's crew had laid in about 200 feet of line from the last manhole. Tr., pp. 278, 279. Stauffer testified that Christian had to relay sewer line that was laid at the wrong grade[29] for a couple of hundred feet, that it had to be dug up, elevated and relaid though not entirely taken out, in the middle of January 2004, and that other problems occurred which caused delays. Tr., pp. 229, 243, 244,

---

[29]The alignment of the sewer line was correct. Tr., p. 229.

32

279.

Stauffer testified that Christian began the sewer lines a few days before Christmas 2003, and did not complete the sewer until they dealt with grade issues, and set manholes, until January 22 or 23, 2004, a job Stauffer testified should have taken about a week instead of a month and similar to the time period required to install the water line.  Tr., pp. 242-244.  Stauffer testified that raising the sewer line took approximately a week.  Tr., p. 279.

Stauffer testified that after main sewer lines and "Ys" are installed, a contractor proceeds to put in 4-inch service lines in either direction to the lots, which Schwarz would monitor, and after the service lines are installed they are marked with a 2x4 or fence post on the end of the line so that a builder knows where to dig to tie into the house sewer line.  Tr., p. 273.  Stauffer testified that after water and sewer lines are installed what should happen is to rough grade the road and swales, then put in conduit in vaults for power and telephone.  Tr., p. 244.  Because of the delay in installing the sewer, Stauffer testified, the road was impassable because the sewer trench was 5 feet deep in the middle of the road.  Tr., p. 243.

Gatzke testified that when he returned from Kenya in late January 2004, he was "very anxious" at the lack of progress because he thought that the bulk of the infrastructure would be done.  Tr., p. 306.  Gatzke testified that he has observed a pattern in his ten years of dealing with Christian that he does not finish projects on time.  Tr., pp. 382-383.  Gatzke testified that he and Christian met on January 26, 2004, when they were under contract to sell Harmony Court to Keystone.  Tr., pp. 344-346.  Gatzke testified that he knew the March 1, 2004, deadline would not be met to get the final plat approved and they risked having to discount $13,000 to Keystone because it would not able to close construction loans in sufficient time to build and sell

33

townhouses[30].  Tr., pp. 344-348; Ex. 17, p. 3.  Gatzke testified that on January 26, 2004, he knew when he met with Christian that the March 1, 2004, deadline for final plat approval would not be met and they went through each item on Ex. 16 to try to reduce their bond amount for the unfinished items as much as possible.  Tr., pp. 346-347.  Gatzke testified that the delay required another month of Caterpillar equipment rental at between $20,000 to $25,000 per month.  Tr., p. 307.

Christian testified that the utilities were very tight and overlapping because the right-of-way was only 40 feet and should have been 50 feet.  Tr., pp. 121-122.  He testified that within the 40 feet the plans for Harmony Court called for swales to be cut on both sides to handle surface water runoff, but that he asked Stauffer about it and Stauffer did not see any need for swales to be cut because another subdivision on Solberg Drive to the north of Harmony Court did not have drainage, and told Christian "don't worry about it" and that they would address it in the future if needed.  Tr., pp. 138, 139, 458.  Stauffer answered "No" when asked if he ever told Christian that he did not have to install swales in the road.  Tr., p. 269.  The swales, Stauffer testified, were the only storm drainage system and were required.  Tr., p. 296.

Christian testified that John Schwartz had a dispute with Dennis Carver of Carver Engineering, which contracts with Evergreen Water & Sewer, and that conflict caught Christian and Gatzke in the middle.  Tr., pp. 139, 140, 141-142, 459-460.  Christian admitted that the disputes included swales, but were mostly regarding the general design, such as the location of garages and dimensions of the structures, for which Christian was not involved.  Tr., p. 460.

---

[30]Gatzke testified that Keystone said they could complete construction of a home in eight weeks.  Tr., p. 348.

34

Stauffer testified that the swales should have been rough graded in but were not.  Tr., p. 244.

Stauffer testified that Evergreen Water did a walkthrough on the project and noted that the swales

were not in, and that Schwarz agreed that the swales had to be there.  Tr., p. 286.  Stauffer

testified that Evergreen Water allowed the project to install culverts in areas where there was not

enough room for a full swale in the narrow right-of-way.  Tr., p. 286.  Gatzke testified that the

photograph on page 7 of Ex. 23 shows a driveway that had to be cut so a culvert could be

installed at Lots 4A and 4B, and page 8 shows a culvert and swale.  Tr., p. 356.  Christian

admitted that he cut the asphalt to install the culvert.  Tr., p. 467.

Christian denied that he installed a "T" in the sewer line hoping to run the line to the

church property to the south of Harmony Court, because it was a gravity line and would end up

above the surface by the time it reached the church property.  Tr., pp. 145-146.  Christian

admitted putting a 20-feet extension in the sewer line and testified that he did it because they

were trying to acquire two lots adjacent to Harmony Court on the south side.  Tr., p. 146.

Christian testified that Stauffer called Glacier Precast to change the drawings and design of the

manhole to accommodate the 20-foot extension.  Tr., p. 147.  Stauffer testified that a "boot", or a

hole in the manhole shown on Ex. 56, page 3 photograph "S5" dated 1/28/04, was not part of the

plans which Schwarz drew up and had approved by Evergreen Sewer and Water, but was

something Christian wanted in order to add a line which would be coming in from the south for

future development.  Tr., pp. 255-256, 280, 281.

Stauffer testified that the manhole went in with the boot, but that it was not Schwarz's job

to approve or "OK" the change, but rather Evergreen Sewer & Water's job, which would own

and operate the system once it was complete.  Tr., p. 256.  Stauffer never changed the plans to

accommodate the "boot".  Tr., p. 256.  He testified that Christian implied to him that Christian had discussed the addition of the boot for later development.  Tr., p. 281.  Christian testified that the swales and the "T" in the sewer line for future hookups were discussed in several meetings with Evergreen Water & Sewer.  Tr., pp. 458-459.

Christian testified that he had a crew working continuously at Harmony Court from January 2004 through March 1, 2004, when weather permitted, including on some weekends when they had to move dirt to keep it from freezing.  Tr., p. 134.  He admitted, however, that he had other crews doing drilling and pumping projects for his other businesses, although he testified that his non-Harmony Court crews required hardly any supervision by him[31].  Tr., pp. 169-170.  Christian testified that it is possible that he sent some of his crew to work on projects other than Harmony Court, but he never sent the whole crew out to other sites.  Tr., pp. 135-136. Stauffer testified that some days, after the work was underway and he was not on site every day, he would drive out to Harmony Court "and there would be nobody there", and he had a hard time contacting Christian.  Tr., pp. 227-228, 247.

Stauffer testified that Christian should have been able to complete the Harmony Court infrastructure by March 1, 2004, although not easily.  Tr., p. 227.  Stauffer testified that initially Christian "got right after it" and installed the water main in good time and correct grade and alignment, but later when they encountered problems things started dragging out.  Tr., pp. 228-229.

Stauffer testified that the final plat for Harmony Court was filed on February 10, 2004.  He

---

[31]Christian testified that he has a contractor's license which allows a licensed driller to drill under his license without Christian being present at the site.  Tr., p. 170.

explained that in order to obtain approval of a final plat the developer needs to show that two-thirds of the improvements are complete, including not only infrastructure but also fees, surveying, and in addition, after the improvements are two-thirds complete and the final plat is permitted to be filed, the developer must bond for any amount of improvements that are not complete. Tr., pp. 245, 282. Gatzke and the Flathead County Board of Commissioners entered into a subdivision improvement agreement that is part of the final approval process, including posting a bond and a schedule of completed items. Tr., pp. 282-283. Ex. J is the subdivision improvement agreement for Harmony Court dated February 6, 2004. Stauffer testified that Ex. J was prepared by Schwarz Engineering and he probably helped prepare it. Tr., p. 284. He testified that the subdivision improvement agreement must be signed by the owner and county commissioners and filed with the final plat and other documents for final approval. Tr., pp. 295, 296.

Ex. J states that the water main is 95% complete and the water service is 100% complete, and Stauffer testified that Christian had nothing to do with putting those numbers in Ex. J. Tr., pp. 284, 285[32]. Other items listed on Ex. J were listed in percentages of completion. Stauffer testified that the lack of swales had nothing to do with completion of gravel or paving, but was related to some degree to items listed on Ex. J with percentages of completion including pit-run, topsoil, areas disturbed under construction, dirt, dry wells. Tr., pp. 288, 289. Stauffer testified that swales would be a separate item if they were separate and located off-road for drainage purposes, but if located along the side of a road they would be part of the road construction item

---

[32]At page 285 Stauffer testified the sewer main is 95% complete – on page 284 the transcript states "water main" 95% complete.

and not identified on a subdivision improvement agreement separately as swales.  Tr., pp. 289, 290.

Stauffer testified that after the final plat was filed in February 2004, Christian had yet to complete and pave the roads, shape the swales, install conduit and vaults for power, telephone, TV, and do tie-ins on the water and sewer on the existing mains.  Tr., pp. 246, 264.  Stauffer testified that the road was not ready to be paved in February 2004, but was only rough-graded and still needed to be finish-graded, then needed a foot of pit-run laid, then needed compaction to grade, then needed 3 or 4 inches of crushed gravel laid to grade, and then needed compaction to make it ready for paving.  Tr., p. 247.  Stauffer testified that Christian did not start such road completion after the final plat was obtained, but worked instead on installing conduit and vaults for the utilities, when he worked.  Tr., pp. 247, 248, 264.  Stauffer testified that not much was being done in February, and that except for the paving[33] Christian could have finished the infrastructure, including the road and items listed on the subdivision improvement agreement, Ex. J, that were not completed in February.  Tr., pp. 248, 262-263.

Christian testified that his primary work on Harmony Court infrastructure was completed either on March 15 or March 25, 2004.  Tr., p. 137.  He testified that he had completed the water main and sewer line without connecting it to the main, but he might have had road crossings left.  Tr., p. 137.  Stauffer confirmed that Christian did not cross the road for a tie-in to the existing main.  Tr., p. 242.

Ex. 55 is a series of photographs taken by Stauffer of the Harmony Court infrastructure,

---

[33]The paving could not be done until the batch plants opened in late April or early May. Tr., p. 248.

including water mains.  Tr., p. 117.  Photographs "S7" and "S8" in Ex. 55 show workers in their shirtsleeves on March 23, 2004, tying into the existing water line across Harmony Road which they completed in a few days.  Tr., pp. 259, 261-262.  Stauffer testified that those tie-ins could have been completed at any time while installing the water line.  Tr., p. 262.

Gatzke testified that the delays in completing the infrastructure were "devastating" to Keystone because it could not start its construction work as scheduled on March 1, 2004, and the result was a "domino effect" where Keystone's original schedule to complete the entire project before the end of the year was broken.  Tr., p. 349.  Gatzke entered into another contract for deed with Keystone dated March 25, 2004, to sell the Harmony Court lots, except for Lots 11A and 11B, for the sum of $1,120,000 in a sliding scale of installment payments. Ex. 19; Tr., pp. 350, 413, 425-426.  Under cross examination Gatzke admitted he did not expect to profit from Keystone's sales unless it defaulted and he got the property back.  Tr., p. 414.

In order to help Keystone obtain financing to construct townhouses, Gatzke signed a mortgage pledging Harmony Court as security to enable Keystone to get a construction loan from First State Bank.  Tr., pp. 416-418; Ex. G.  Gatzke testified that he discussed the mortgage with Christian before and after he signed it and told Christian that First State Bank wanted a mortgage on Harmony Court in order to avoid being left with a mortgage on a townhouse but not the underlying real property in case Keystone dropped out.  Tr., p. 418.  Gatzke testified that Christian was not happy about the mortgage, and neither was Gatzke but they could not sell the property without the mortgage.  Tr., p. 450.

Christian testified that the final plat for Harmony Court was approved on March 25, 2004. Tr., p. 128.  Stauffer testified that Christian was still installing utility conduits, road shaping and

39

grading when the plat was approved.  Tr., p. 263.  Christian denied that electrical pedestals were

in the way when swales needed to be cut in the road after March 2004.  Tr., pp. 140-141.  He

testified that Keystone was premature in several things they did, including installing sod right up

to the pavement in late March or April 2004.  Tr., p. 141.  Stauffer testified that builders would

assume that everything was finished when the pavement was down and sod and landscaping.  Tr.,

p. 294.  Ex. 23, page 3, is a photograph taken by Gatzke showing sod and landscaping to the road

with no swales, and the sod and driveways had to be torn up and culverts installed.  Tr., pp. 294-

295, 296, 352.

Stauffer testified that in May 2004 they tested the water main. Tr., p. 263.  Photographs

"S9" and "S10" of Ex. 55, dated May 25, 2004, show a broken sewer line with a water clamp

repair saddle or "patch sleeve" which was broken while digging to tie conduit into a power pole.

Tr., p. 260.  Stauffer testified that that repair is expensive, but that Evergreen Sewer & Water had

the necessary part on hand to fix it and sold it to Harmony Court.  Tr., p. 260.

During the summer of 2004, Stauffer testified, Christian worked on the road and completed

some utility crossings.  Tr., p. 264.  But much of the time during June and July when Stauffer

went to the site he found no activity, and he testified that he could not reach Christian.  Tr., p.

265.  Stauffer testified that building construction occurred at Harmony Court during the summer

of 2004, although Schwarz did not monitor it.  Tr., pp. 290, 291.  Amy Ockey testified that

Keystone pulled all its crews off the site for a week in the summer of 2004 to allow Christian to

complete the infrastructure, but a week later the infrastructure was not finished.  Ex. 36, pp. 14-

15.

Stauffer testified that the infrastructure continued to be worked on for six months, that he

40

performed compaction tests in August, and the road finally was ready for paving in September 2004.  Tr., pp. 264, 265, 266.  He testified that he has seen projects in which roads are ready for paving in a week.  Tr., p. 265.  Stauffer testified that Schwarz Engineering was not involved in selecting the asphalt contractor for the road at Harmony Court.  Tr., p. 291.  He testified that the paver was a subcontractor of Christian's, and that as contractor Christian is ultimately responsible for all the subcontractors.  Tr., p. 267.

Stauffer testified that the pavers "did a lousy job", including letting the paving mix cool while sitting in a truck instead of laying it down, rolling and compacting while the mix was hot.  Tr., pp. 266, 293.  An agreement was made between the owners and pavers to come in the following year and lay another 2-inch "lift" or "overlay" on the pavement.  Tr., pp. 267-268, 292.  When the new lift was put on, Stauffer testified that a cul-de-sac was not placed in Harmony Court with a radius in accordance with Schwarz's plans.  Tr., p. 270.

What remained then, according to Stauffer, were the swales in the road, which are important for storm drainage when there are no curbs and gutters and which were called for in Schwarz's plans.  Tr., p. 268.  Christian attributed the lack of swales to the conflicting relationship between Schwartz Engineering and the engineer for Evergreen Water & Sewer.  Tr., pp. 141-142.  Stauffer testified that swales were part of the plans for the road and should have been installed, but were not.  Tr., pp. 229, 268.

Eventually, Christian testified, he did almost all the work cutting swales in the road in late fall and early winter 2004, using a Bobcat with mini excavator, and a backhoe leased from Western States, but that John Schwarz cut other swales.  Tr., pp. 142, 143-144, 353, 461.  Christian testified that Gatzke wrote the check paying for the lease of the backhoe to cut the

41

swales.  Tr., p. 144.  Stauffer testified that Christian did some swales on the east end of Harmony Court after Evergreen Water demanded they be put in, but the job was not completed quickly enough. The lot buyers had landscaped and sodded right up to the roads and swales were nonexistent, and in November 2004 Gatzke hired Schwarz Construction, to shape and form the swales.  Tr., pp. 268, 269, 293, 353.

Stauffer testified that Christian failed to install sewer services on certain Harmony Court lots, which resulted in the pavement having to be cut up to install service lines.  Tr., pp. 270-271. Gatzke testified that Christian failed to install sewer and water "taps" into the main lines for Lots 9A, 9B, 10A and 10B, all the way to the property line, and some of the "taps" were left under asphalt which had to be dug up.  Tr., p. 362; Ex. 24.  Gatzke testified that Ex. 23, photo no. 22, shows cuts in Harmony Court Road where Evergreen Water & Sewer had to cut the road to find the sewer line.  Tr., pp. 358, 362.  Ex. 25 is the bill from Evergreen Sewer & Water[34] for the water and sewer "taps".  Tr., p. 362.

Gatzke testified that Ex. 23, page 4, is a photograph of a crew he hired to install electric conduits for Lots 11A and 11B which had been missing.  Tr., p. 354.  Christian agreed that photograph no. 4 shows conduit being installed, but testified that when Schwarz Construction started cutting swales in the road it dug through and excavated conduit which had been installed. Tr., pp. 466-467.

Stauffer testified that in his opinion some of the work Christian did was okay, some of it was substandard and the contractor is ultimately responsible, but Stauffer stressed the time issue

---

[34]Gatzke testified that Flathead County Water & Sewer District #1 on Ex. 25 is Evergreen Sewer & Water.  Tr., p. 362.

from delays and the inexperience of the crew were the biggest problems.  Tr., pp. 274, 276.

Stauffer testified that any contractor, whether one with an ownership interest or not, should be

motivated by cost to complete a project on time the first time, and he did not believe Christian

acted in that manner at Harmony Court.  Tr., pp. 275, 276.

John Schwarz wrote a letter to the Flathead County Board of Commissioners, Ex. 22, dated

January 3, 2005, stating that all required improvements for Harmony Court were complete and in

place.  Tr., pp. 352, 438.  Gatzke testified that they understood the infrastructure was complete,

but the general ledger entries show additional work detailed below.  Tr., p. 438.  Amy Ockey

testified that Keystone permanently pulled off the Harmony Court job the second week of

January 2005, and the infrastructure was still not complete.  Ex. 36, p. 15.  Gatzke testified that

Keystone defaulted on its contract with him, and the Gatzke Trust bought all the Harmony Court

lots back from Keystone.  Tr., p. 351.

The general ledger in Ex. 2, pages 10 and 11, under the heading "For Infrastructure

(Ledger)" lists charges totaling $69,936.47 incurred beginning 1/19/2005 through 8/21/2006.

Tr., pp. 438, 439.  On redirect examination Gatzke testified that a number of small problems

remained with the infrastructure that had to be fixed, as shown by the general ledger entries in

Ex. 2, pages 10 and 11.  Tr., pp. 442.

The first such entry on the top of page 10 of the general ledger in Ex. 2, dated 1/19/2005 in

the amount of $1,669.84, number 56, Gatzke testified, was for cement pea gravel.  Tr., p. 444.

Another entry Gatzke testified about was number 219 dated 3/30/2005, in the amount of $451.25,

which Gatzke testified was earthwork and grading required in front of Lots 7A and 7B to

complete the lots.  Tr., pp. 444-446.  Gatzke testified that a third entry on page 11 of the general

ledger, number 1115, to Evergreen Water in the amount of $879.80 dated 8/17/2005, which

Gatzke testified was also reflected on Ex. 25, as a check in that amount numbered 1097, paid to

extend sewer lines and to do water taps for Lots 9A, 9B, 10A, and 10B, even though the invoice

reflects charges for all of the following items amounting to a total sum of $3,219.80:  crushed

rock to bed and cover up water taps which had not been done on Lots 9A, 9B, 10A and 10B; a

camera in the sewer lines to find the missing sewer stubs; 120 feet of sewer pipe to reach the

property lines; and 4 hours of backhoe work.  Tr., pp. 446, 447; Ex. 25.  Gatzke testified that all

of the costs in the total amount of $69,936.47, listed on pages 10 and 11 under "For

Infrastructure (Ledger)," were to finish the infrastructure and complete the construction of the

property and townhouses.  Tr., p. 448.

Stauffer testified that about 3,300 cubic yards of material were excavated and removed

from Harmony Court during the development, which was worth about $6 per cubic yard[35].  Tr.,

pp. 271, 272.  Gatzke testified that pages 11 and 12 of Ex. 23 are photographs of the area from

which soil had been removed by "mining".  Tr., pp. 357, 358.  Christian testified that he took pit

run from Lots 9 and 10 because it was gravelly, and filled a hole near Solberg Drive to support a

slab for a garage he moved from the rear of the "Kline property"[36].  Tr., p. 462.  He also testified

that there had been branches and trash on that lot, which were no good for backfill or road base,

which he removed, and that he also moved dirt several times for Keystone and placed some

material on an adjacent neighbor's property to level off the transition.  Tr., pp. 463. 464.

---

[35]The value at $6 per cubic yard is $19,800.

[36]Christian testified that the "Kline property" was part of Harmony Court initially, but
determined otherwise in Adv. No. 06-00043.  Tr., pp. 462-463.

Christian admitted removing from 318 Solberg and 312 Solberg several items, including kitchen appliances, bathtub, sink and shower, washer and dryer, riding lawn mower and other items, which Christian testified he gave to various persons working for him because they were not included in the sale and he believed the residence was going to be destroyed.  Tr., p. 171-172; Ex. 54, p. 7 (Interrogatory No. 10 & answer).  Christian later testified that two washers, two dryers and a stove were in the garage on the property and that Gatzke gave them away.  Tr., p. 176.

Ex. 52 is a buy-sell agreement dated February 11, 2004, by which Christian on behalf of Northstar Properties sold 318 Solberg[37] to the Gatzke Trust.  Tr., p. 172.  Page 1 of Ex. 52 provides at page 1:

> "All permanently installed fixtures and fittings that are attached to the Property are included in the purchase price, such as electrical, plumbing and heating fixtures, wood stoves, built-in appliances, screens, storm doors, storm windows, curtain rods and hardware, attached floor coverings, TV antennas, air cooler or conditioner, garage door openers and controls, attached fireplace equipment, mailbox, and trees and shrubs attached to the property and attached to the building except ... none."

Tr., pp. 173-174.  Christian testified that appliances were not included because they are personal property and he was allowed to remove them.  Tr., p. 174.  Christian testified that he removed the bathtub because he had paid for it and was told by Gatzke that the house was going to be demolished, although he does not know whether it was torn down, and he believed he had an interest in Harmony Court and did not need permission.  Tr., pp. 174, 175.  Gatzke testified that Ex. 23, nos. 27, 28, 29, 30 and 31 show where Christian had removed a washer and dryer, sink,

---

[37]Christian testified that Ex. 52 represents the sale of the "Johnson property" which they needed for a road outlet to Solberg and for approval of the road on Harmony.  Tr., p. 173.

refrigerator and stove, door, and a tub/shower.  Tr., pp. 359, 360.  Gatzke offered no evidence of the value of the removed items.

Gatzke testified that he had agreed with Keystone that he could continue to use 318 Solberg Drive as a rental until it could be removed.  Tr., p. 359.  Christian testified that he tried to rent 318 Solberg, but that he and Gatzke decided instead to use the house and garage for storage of transits and handtools.  Tr., p. 468.

Christian testified that Ex. C shows rental income and expenses received on 318 Solberg, 326 Harmony and 324 Harmony for rent of house, lot and double wide trailer.  Tr., pp. 468, 469. Ex. C shows a small gain and then losses, which Christian attributed to interest he paid on the contract with the Johnsons.  Tr., pp. 469,470.

Gatzke testified that when Harmony Court was deeded back to him by Keystone it was subject to encumbrances for construction financing of about $700,000.  Tr., pp. 351-352; Ex. 22. He testified that if he had not taken over and completed the development after Keystone defaulted "everyone would have lost", including Gatzke and Christian and all the lienholders. Tr., p. 450.  On recross examination Gatzke testified that there were unfinished townhouses when he took back Harmony Court from Keystone, which he completed in order to sell.  Tr., p. 456. During the course of his Chapter 11 bankruptcy case, Gatzke moved for leave to sell fourteen vacant lots taken back from Keystone for $525,010.00 and an additional $75,000 for Lots 11A and 11B.  Ex. L; Tr., pp. 421-423.  Gatzke testified that he also moved for approval of sale of five finished townhouses.  Ex. M; Tr., p. 424.

### D.  Harmony Court Accounting

Christian testified that he did not have a separate accounting system for his projects with

46

Gatzke, and that the bills for items he ordered would go on Gatzke's account or be sent to Gatzke who would pay them. Tr., pp. 179-180. He admitted that he has not provided Gatzke with an accounting for Harmony Court expenses except for $6,000. Tr., p. 180. Gatzke testified that he thought the accounting for the Harmony Court project would be an ongoing thing with Christian. Tr., p. 364. Gatzke testified that he regularly asked Christian for receipts and invoices of all expenditures, but Christian never provided them. Tr., pp. 363, 364. Ex. 2 is Gatzke's profit and loss, balance sheet and general ledger for the Harmony Court investment, as compiled by Pendleton and another bookkeeper from information provided by Gatzke.

Gatzke testified that he had placed his American Express card number at Northwest Pipefitting, and that Christian would charge purchases at Northwest Pipefitting on Gatzke's card but never provided Gatzke with invoices as he demanded. Tr., p. 364, 440. Gatzke testified that Christian was supposed to call Gazke each time he made a charge on Gatzke's account at Northwest Pipefittings, and then it would be charged to Gatzke's card. Tr., p. 440. Gatzke testified that he received the amount of each charge from Northwest Pipefittings on his monthly American Express statement, but those statements gave Gatzke no indication of what the charges were. Tr., pp. 441, 450-451.

Gatzke testified that he seeks reimbursement from Christian for all the Northwest Pipefittings charges made by Christian shown on the general ledger, pages 6-8 on Ex. 2. Tr., p. 441. Gatzke testified that he took all his American Express statements to Northwest and asked them to pull the invoices matching the charges, but Northwest Pipefittings's employees complained that he was asking for a tremendous amount of work and told him they had given the invoices to Christian. Tr., p. 451. Eventually they searched their computer records and gave

Gatzke copies of the invoices, which Gatzke took to the parts counter where he was told that many of the invoices were for well-drilling and had nothing to do with Harmony Court. Tr., p. 452. Gatzke testified that Christian would begin to pay for a purchase at Northwest Pipefittings with a check, but then demand the check back after making several more purchases, and would charge the new total to Gatzke's American Express card, and he charged an aggregate amount of $80,996.51, as reflected, on page 8 of the general ledger, Ex. 2. Tr., pp. 452-454.

Ex. 1 is Gatzke's accounting summary dated 11/1/06. Ex. 1 shows Harmony Court total income in the amount of $2,933,818.06, not including rental income paid to Christian, which he did not report to Gatzke. Item A3 on Ex. 1, p.1, estimates future sale of Lots 11A and 11B using a basis of $56,920.74. Gatzke testified that all the Harmony Court lots except Lots 11A and 11B have been sold, and he came up with the $45,000 estimated lot value for Lots 11A and 11B because they are more level and clear than other lots which had sold for $42,300 and $42,500. Tr., p. 316. Under cross examination Gatzke agreed that page 1 of Ex. 1 and Part B on page 2 of Ex. 1 includes all income from Harmony Court, for vacant lots, town homes and constructed homes. Tr., pp. 426-427.

Page 2 of Ex. 1, Part B1 states Harmony Court expenses in the total amount of $3,014,019.53. Tr., p. 51. The expenses in Part B1 are stated in the net amount of $2,646,923.70, and B2 adds $50,000 to settle Rocky Mountain Lumber's lien, but the $2,646,923.70 excludes cost overruns from the Harmony Court infrastructure stated in the amount of $367,095.87. Gatzke testified that he placed the cost overruns under part D of Ex. 1, page 2, because his contract with Christian for the infrastructure was for $230,000, and when he asked Christian about the overruns Christian stated: "Charge it off to my share of the profits."

48

Tr., p. 318. Without taking into account the overruns Ex. 1, page 2 shows income over expenses of $236,894.36. Part D of Ex. 1 then calculates Christian's two-third share of $236,894.36 as $157,929.57, then subtracts the $367,095.87 infrastructure cost overruns and $50,000 in advances to Christian, and concludes Part D with a calculated amount of $259,166.30. after accounting for loans, credits, offsets and advances owed by Christian.

Ex. 1 also includes at pages 3-4 several charges marked "unknown[38]" and several charges for other projects and properties other than Harmony Court, including Cedar Point, the church property and Kila. The charges related to other properties and are not properly part of the Harmony Court accounting and not recoverable under the Harmony Court contract. The charges marked "unknown" on Ex. 1 are useless for purposes of accounting.

Gatzke testified that Christian should pay him for use of the equipment intended to be used on other unrelated projects. Tr., p. 405. Gatzke's Ex. 1, page 3, lists amounts for unpaid equipment rentals on Harmony Court through March 31, 2005, for which Gatzke requests payment from Christian in the total amount of $86,139, but those rentals are not supported or provided for under any written agreement signed by Christian. By contrast, the lease payments Gatzke made to dealers for the Caterpillar equipment and Bobcat used at Harmony Court are properly part of the Harmony Court accounting, and Christian agreed to repay those.

Gatzke testified that approximately $200,000 was paid on equipment rental. Tr., p. 319, 405-06. In Adversary No. 06-00042, Christian testified at trial the lease payments on the Caterpillar equipment totaled $170,000. Memorandum of Decision in Adv. No. 06-00042

---

[38]One "unknown" item is gravel Gatzke alleges Christian stole. When asked on direct examination about the gravel Gatzke testified he did not know the amount. Tr., p. 321,

(Docket No. 32), p. 22.  Christian also testified in Adv. No. 06-00042 that he agreed that Gatzke would provide the funds for the equipment and Christian would pay for the equipment out his share of the Harmony Court profits.  Memorandum of Decision in Adv. No. 06-00042 (Docket No. 32), p. 20.  The general ledger at pages 8 and 9 in Ex. 2 list the Parsons charges, which sold the Bobcat to Gatzke, totaling $25,781.35, and Western States Equipment charges on page 8 are stated in the amount of $206,876.56.  Ex. 4, page 1, which was admitted into evidence in Adv. No. 06-00042 (Docket No. 25), and includes lease payment credits paid by Gatzke totaling $209,647.00, not including the Bobcat, toward his purchase of Caterpillar equipment.  Since Christian and Schwarz both testified that Christian worked on the Harmony Court infrastructure past March 31, 2005, including cutting swales, and Christian testified that Gatzke could recover equipment rentals from Christian's share of profits, Gatzke is entitled to recover the costs of the Caterpillar equipment rental and Bobcat payments which he paid to the dealers in this accounting.

Gatzke testified that the $535,676.75 entry on page 2 of the general ledger in Ex. 2 described as "Receipts from FSB Loan" is what went to pay off the construction loans on the townhouses.  Tr., pp. 419-420.  Below that is "Receipts from Keystone" continuing to page 3 of the general ledger, in the total amount of $608,000.  Gatzke testified that he received that $608,000 from Keystone as they were building townhouses and closing sales pursuant to Ex. 19, and refunds on utility for water hookups.  Tr., p. 420.

Under cross examination Gatzke testified regarding the category "Total Expenditures for General Development Harmony Engineering/Surveying on the general ledger in Ex. 2 beginning at page 3.  The total for Harmony Engineering and Surveying is $48,802.58.  General Ledger in

Ex. 2, p. 4; Tr., pp. 427-428. The entry for "Harmony Purchase" on page 5 of the general ledger, in the sum of $194,869.08, are the amounts Gatzke paid to several entities to purchase Harmony Court, Gatzke testified. Tr., pp. 428-429; Ex. 2. The total for "General Development" is $264,366.79. Tr., p. 429; General Ledger at p. 5 in Ex. 2.

Gatzke testified that the general ledger entries at pages 5 and 6 were cash payments to Christian in the total amount of $250,000 for the Harmony Court infrastructure. Tr., p. 429. Gatzke testified that the $50,000 "Advances to Christian" on Ex. 1, page 2, Part D, are not related to Harmony Court but relate to a property Christian owned in Polson. Tr., p. 319. Ordinarily that $50,000 would therefore not be part of the Harmony Court accounting. However, Gatzke testified that $50,000 of the $250,000 was for loans which Christian asked be applied against his share of profits. Tr., p. 430. Gatzke denied double billing Christian for a $2,000 entry to Pat Christensen under "Harmony Purchase" dated 2/21/2001 and a $2,500 entry under infrastructure also dated 2/21/2001 on page 5 of the general ledger. Gatzke explained that he loaned Christian $2,000 for the earnest payment and gave him an additional $500 in cash for his personal use. Tr., pp. 430, 431; Ex. N.

Page 6 of the general ledger includes amounts paid on behalf of Northstar Properties totaling $60,699.23, which Gatzke testified Christian asked him to pay off on Christian's behalf. Tr., p. 434. Pages 6 through 8 list entries headed "Northwest Pipe (for Northstar)" totaling $80,996.41, all but the last three[39] of which Gatzke testified were Christian's charges to Gatzke's account, after Gatzke met with the manager of Northwest Pipe as discussed above. Tr., pp. 434-435, 440.

---

[39]Two of the last 3 entries for Northwest Pipe were credits or refunds, and Christian did not make the 8/9/2005 charge of $141.54. Tr., p. 439.

The next category on page 8 of the general ledger is headed "Parsons/prior to and 2004"

totaling $25,761.35, which Gatzke testified were payments made for the purchase of the Bobcat.

Tr., p. 436.  Gatzke testified that it was cheaper to purchase the Bobcat than to rent it, but he told

Pendleton to charge the Parsons payments as rental to Northstar Properties because it was less of

a charge than the purchase.  Tr., p. 436.  Gatzke testified that he wrote the $1,931.89 check every

month for the Bobcat.  Tr., p. 436.  In the Memorandum of Decision entered in Adv. No. 06-

00042 on February 8, 2007 (Docket No. 32), at pages 17 and 32 n.30, Gatzke stated that he has

no problem with allowing Christian a $2,500 credit to reflect Christian's $2,500 payment for the

Bobcat, and the Court will allow Christian that $2,500 credit.

The next category is "Western States" on pages 8 and 9 of the general ledger for a total of

$206,876.56 paid to the Caterpillar dealership in Kalispell. Gatzke testified that the bulk of such

charges were for equipment rental.  Tr., pp. 436-437.  The "Total for Infrastructure" on Ex. 2,

general ledger, at the bottom of page 9, is $624,652.01 which Gatzke testified was correct and

includes equipment charges and overruns.  Tr., p. 437.  Pages10 and 11 of the general ledger,

under the heading "For Infrastructure (Ledger)" lists charges totaling $69,936.47 incurred

beginning 1/19/2005 through 8/21/2006, after John Schwarz wrote to the county announcing

completion of Harmony Court infrastructure.  Tr., pp. 438, 439.

Ex. 57 is Gatzke's reworking of the summary of the purchase prices of the equipment, and

additional costs from his sale of the equipment and lease payments.  Tr., pp. 364-367.  Gatzke

testified that he waived substantial repossession expenses, is still missing the laser and shredder

attachments for the Bobcat which Christian was ordered to cooperate in recovering, and sold the

Bobcat and attachments he repossessed on consignment, for a total selling price of $184,567.57.

Tr., pp. 367-368; Ex. 57, p. 2.  From what Gatzke paid of $171,591.15, adding $12,976.42 for the Wacker and missing Bobcat attachments, less other charges, Gatzke testified that after liquidating the equipment Christian still owes him $16,201.73.  Ex. 57, p. 2.  Tr., p. 370.  When the Wacker is sold, Gatzke estimates that Christian would still owe him around $10,000 on the equipment.  Tr., p. 371.

Under cross examination Gatzke testified that he took the lesser of the lease payments or his net costs after recovering what he spent to purchase the Bobcat and Caterpillar equipment, and included that in infrastructure overcharges on Ex. 1.  Tr., pp. 404-406.  Gatzke described the $29,178.15 "other expenses" on Ex. 57, p. 2, as closing costs on purchasing the equipment.  Tr., p. 407.  When asked about Ex. K, an insurance check for $23,000 on the excavator, Gatzke testified that the $23,000 would be an offset against the $29,178.15.  Tr., pp. 407, 408.  On redirect Gatzke admitted that the insurance check would bring Ex. 57 into a positive balance for Christian, but that if he included his repossession expenses it would still have a negative balance.  Tr., p. 455.

Gatzke testified that he paid Schwarz Engineering's entire bill to Christian on Ex. 3, in the amount of $17,054.00, which includes bills for Cedar Park, the church property, and other projects because Schwarz was working for Gatzke on Harmony Court and Gatzke was afraid of losing Schwarz, so Gatzke went ahead and paid Schwarz the entire amount with the intention that he would take it out of Christian's share of profits.  Tr., p. 324, 325.

Gatzke paid other bills incurred by Christian and Bearcat Drilling which he felt were not related to Harmony Court. Gatzke testified that he paid Christian's bill to Marquardt &

Marquardt Surveying, Inc., shown by Ex. 4[40], because he needed their services and they refused to do work for Gatzke until the bill was paid.  Tr., pp. 325-326.  However, Christian testified that Ex. 4 in fact was for surveying work done on Harmony Court in the amounts of $1,872.50 and $3,050.  Tr., p. 481.

Ex. 5 lists several entries related to a "Deer Park" project[41] in which Gatzke testified he served merely as a lender to Christian.  Tr., pp. 326, 327.  The total on Ex. 5, page 2 is $46,884.45.  Tr., p. 330.  Gatzke testified that Christian failed to record the note and mortgage which they both signed in relation to Deer Park.  Tr., p. 330.  Christian did not recall whether Gatzke gave him an original mortgage involving Deer Park to record.  Tr., pp. 502, 503

Ex. 7 is a ledger for a well drilling project in Glacier National Park for which Gatzke allowed Christian to use his line of credit to purchase materials and pay a bond.  Tr., pp. 331, 332, 474.  Gatzke testified that Christian never paid him back, and as a result the bond attached to Gatzke's letter of credit and prevented him from using it, and Gatzke lost that line of credit.  Tr., p. 333.  Gatzke questioned whether Harmony Court materials were being used on Christian's Glacier well project, but offered no evidence.  Tr., p. 333.  Gatzke included the Glacier Park well reimbursement on Ex. 1, page 3, in the sum of $1,226.38.  Tr., p. 333.  Christian conceded that he owes Gatzke those funds.  Tr., p. 474.

---

[40]The bill was for $5,558.35 dated 10/31/2004.  Gatzke paid it with a note stating that if his name is not on a project/invoice he will not pay for future charges incurred by Christian.  Christian insisted that the work was done on Harmony Court.

[41]The Terry Pietron item in Ex. 5 for $350.46 was not a Deer Park item, Gatzke testified, but was for work done on Christian's Polson house, and not Deer Park.  Tr., p. 328.  Christian testified that his dispute with Gatzke over the Polson property is subject to pending state court litigation in Lake County, and pending litigation exists in Flathead County district court involving the "Altender property".  Tr., p. 472

Gatzke testified about the "Kila" project which was going to be a "fast in-and-out kind of thing" where they could buy land in the Kila area, put $30,000 into it and sell it for $50,000 in 90 days.  Tr., p. 334.  The expenditures for the Kila project are listed on Ex. 8, and total $85,130.41 without interest.  Tr., p. 337.  Christian testified that he recalls Gatzke asking him about the accounting of the Kila project, but does not remember going through any accounting and claims that he paid Gatzke $38,000 without an accounting.  Gatzke testified that the Kila project ended up taking 3 to 4 years, is still not completed and a lawsuit is pending.  Tr., p. 336.  Gatzke included the Kila project on Ex. 1, page 3, in the amount of $85,892.03.  Christian testified that the Kila property project evolved and now involves a series of loans from Gatzke to the owner Jo Brown, and the property was transferred into Christian's wife's name and is in litigation.  Tr., pp. 475-478.

Ex. 9 is for well drilling parts for Bearcat Drilling, for which Christian did not have the money and he asked Gatzke to pay it and he would reimburse him, but never did.  Tr., pp. 337-338.  Gatzke included $5,545.69 on Ex. 1, page 3, for the well-drilling rig parts.

Ex. 10 reflects the advances Gatzke made to Christian totaling $50,000, about $40,000 of which was owed by Christian on the Polson house.  Tr., pp. 338-339.  That $50,000 in advances appears on Ex. 1, page 2, at Part D – advances, as discussed above, which Gatzke testified was for loans which Christian asked be applied against his share of profits.  Tr., p. 430.  On July 19, 2001, Gatzke on behalf of the Gatzke Trust signed on July 19, 2001, a quit claim deed of the SW1/4SW1/4 of Section 14, Township 22 North, Range 21 West, P.M.M., Lake County, Montana, further identified as Tract 3 on Subdivision Plant No. 5, Lake County, Montana, to Sandy Christian.  Ex. 59.  Christian testified that in 2001 he owed Gatzke money on property

located in Polson, Montana, which was titled in the name of Christian's wife and son.  Tr., p.

500.  Ex. 59 shows that Christian recorded Ex. 59 on July 22, 2005.  Tr., p. 498.  Christian

admitted recording Ex. 59.  Tr., p. 498.  Christian testified in response to several questions on

cross examination that he does not know how he came into possession of Ex. 59, but he denied

Gatzke's accusation that Christian took Ex. 59 from Gatzke's house.  Tr., pp. 498, 499, 501.

Gatzke testified that he sold the drilling rig which was the subject of Adversary No. 06-

00042 for $20,000.  Ex. 11 is Gatzke's revisions to his request for damages in that adversary,

including a per foot drilling charge, use of the Caterpillar equipment and Bobcat since April 1,

2005, and damage to the equipment.  Tr., p. 339.  As noted above, however, there is no written

agreement between the parties covering the drilling rig or equipment rental.

### E.  Pendleton Testimony

Judy Pendleton is a bookkeeper and MBA, who has taught a course in QuickBooks at

Flathead Valley Community College.  Gatzke hired Pendleton to organize information for the

Harmony Court development using QuickBooks.  Pendleton took data which had been entered

into QuickBooks in a checkbook format, and recorded entries to a chart of accounts.  She

testified that she asked Gatzke for supporting documents for entries which she did on her own,

but not for entries which had been made before she became bookkeeper.  Tr., pp. 37, 56.  On

cross examination she testified that the data entries were made into Quickbooks from log sheets

made with reference information given to her by Gatzke.  Tr., p. 56.  Pendleton testified that she

spoke with both the prior input person and Gatzke about entries and their classification for which

she was uncertain, but she did not discuss all entries with them.  Tr., p. 57.

Pendleton prepared Ex. 2, which consists of a profit & loss statement, balance sheet, and the

general ledger for Harmony Court which she testified she prepared between August 20, 2006, to August 31, 2006.  Tr., p. 38.  On cross examination Pendleton explained that page 1 of Ex. 2 covers from January 2001 through December 2006, and shows a negative net income of $428,593.21, resulting from total income from sales of Harmony Court lots in the amount of $2,585,426.32 and total expenses in the amount of $3,014,019.53.  She clarified that all the entries on the profit & loss statement reflect basis pertaining only to properties that have been sold, and therefore do not include Lots 11A and 11B.  Tr., p. 58-59.  Pendleton testified that the basis for the sold lots was calculated at the time of the sales to Keystone, and calculated from all of the costs that had been incurred to that date.  Tr., p. 58-59.

Certain Harmony Court vacant lots with some infrastructure improvements were sold to Keystone for $1,120,000, but Keystone defaulted after paying about $600,000 in cash, she testified.  Tr., pp. 39, 55, 61.  The Keystone lots were given back to Gatzke and accounted on Ex. 2 as $520,000 which was still owed on the installment note.  Tr., p. 40.  Gatzke sold improved vacant lots for $1,331,1000.  Tr., p. 54; Ex. 2, p. 1.  The sums of $48,682.28 and $134,325 listed on the first page of Ex. 2 were holdbacks because of Defendants' liens on properties that were sold.  Tr., p. 40.

First State Bank owned certain Harmony Court lots after Gatzke transferred them to it, and proceeds from the sales of the lots were applied to the loan in the amount of $501,273.60.  Ex. 2, p. 1; Tr., p. 41.  Next a holdback for Rocky Mountain Lumber in the sum of $113,695.00 is listed on Ex. 2, p. 1, but Pendleton testified that Gatzke reached a settlement of that lien for $50,000, based upon which she recalculated the expected payment from the Rocky Mountain holdback at Alliance Title on Ex. 1, p. 1, no. 4, as $63,965.20.  Tr., pp. 50-51.

Lot purchase and development on Ex. 2, p. 1, listed as the first expense in the sum of $202,893.72, was the cost of purchasing the land and surveying fees. Tr., p. 43. The $230,000 for "Infrastructure Contract" was the amount of Gatzke's contract with Christian and/or Northstar Properties to do infrastructure. Ex. 2, p. 1; Tr., p. 43. The next entry is "Infrastructure Overruns" listed in the amount of $367,095.67 which Pendleton testified were actually paid over and above the $230,000 infrastructure payments. Tr., pp. 43, 59. Several of the expenses listed on page 1 of Ex. 2 were costs added after Gatzke took Harmony Court back from Keystone, including paying costs incurred by Keystone for utility fees. Tr., pp. 43-44. Pendleton testified that she recorded the unpaid contract balance owing by Keystone in the amount of $520,000, as an asset after Gatzke took the lots back and then when Gatzke sold the lots that amount was included as an expense identified as "Repossessed Lot Basis II". Tr., pp. 45, 60. Other expenses listed on page 1 of Ex. 2 include realtor commissions on sold lots, property taxes, utilities, and $84,987.07 in interest paid on First State Bank loans. Tr., p. 46.

The third page of Ex. 2 is a balance sheet dated December 31, 2006, for Harmony Court, which includes a $50,000 entry for "Other Current Assets Northstar/Christian Advance/Ln". Pendleton testified that that $50,000 entry is the total of entries of payments made directly to Northstar Properties or Christian, according to Gatzke's records that were going to be advances against future profits[42]. Tr., p. 55. Lot 11A and 11B are listed on Ex. 2, page 3, as fixed assets. Pendelton testified that Lots 11A and 11B have not been sold, but the total of $56,920.74 is the basis for the 2 lots on the third page of Ex. 2. Tr., p. 58.

Page 5 of the general ledger in Ex. 2 includes entries under the bold heading "For

---

[42]See Gatzke's testimony discussed above regarding the $50,000 at Tr., p. 319.

Infrastructure (Northstar) Paid to Northstar/Christian". Ex. 2. Pendleton testified that those entries are payments directly to Northstar Properties and/or Jim Christian for infrastructure costs. Tr., p. 49. The following page 6 of the general ledger in Ex. 2 states the total of those direct payments are $250,000 through 9/15/04, which includes the $50,000 advances Pendleton discussed earlier from the third page of Ex. 2. Tr., p. 49. Pendleton testified that the entries marked "W/D" stood for "withdrawal" and were advances to Christian against future profits. Tr., pp. 49, 55. On cross examination Pendleton testified that those payments were not made to Christian for his infrastructure work. Tr., p. 56.

Page 6 of the general ledger, Ex. 2, includes a section headed "Paid on Behalf of Northstar" with entries totaling $60,699.23. Pendleton testified that those entries were additional payments for infrastructure costs that were paid by Gatzke on behalf of Northstar Properties for the payees listed. Tr., p. 49. A similar grouping follows on the general ledger, pages 6-8 for payments made to Northwest Pipe for Northstar in the amount of $80,996.51. Tr., pp. 49-50

### F. Christian's Proofs of Claim

Northstar Development filed Proof of Claim No. 11 in Gatzke's Chapter 11 case on March 31, 2006, asserting a secured claim in the amount of $176,247.40 for "services performed" and secured by construction liens on Harmony Court which have been invalidated. Christian testified that he did not know from where the $176,247.40 figure came. Tr., p. 177.

Christian filed Proof of Claim No. 10 in Gatzke's Chapter 11 case on March 31, 2006, asserting an unsecured claim in the amount of $1,101,599.37[43] for "services performed". The

---

[43]The Transcript is in error about the amount of Christian's Proof of Claim No. 10, which states the amount of the claim as $1,101,599.37. The Transcript at page 178 states the amount as $1,101,999.37.

attachment to Proof of Claim No. 10 states that Christian's claim remains to be litigated but includes:  Expenses incurred in obtaining replacement for equipment Gatzke wrongfully took possession of ($15,050.00); value of equipment claimed by Christian wrongfully taken by Gatzke ($420,425.00); expenses paid by Christian toward development of Harmony Court ($6,124.37); Christian's percentage of profit from Harmony Court ($600,000.00); and expenses Christian will incur to acquire equipment to complete an ongoing project ($60,000.00).  The attachment further acknowledges that the equipment was subject to an agreement with Gatzke to pay for the equipment out of Christian's shares of the Harmony Court.  The attachment adds claims for Christian of a 2/3 ownership of profits from Cedar Park, the Klain property in Harmony Court and outright ownership in Lots 11A and 11B of Harmony Court.  Tr., pp. 178-179.

Gatzke filed objections to both Christian's and Northstar Development's Proofs of Claim 10 and 11 in his Chapter 11 case, seeking disallowance of both claims.  Those contested matters were combined with the instant Adversary Proceeding for trial.

Prior litigation between the parties in Adversary Proceeding Nos. 06-00042 and 06-00043 resulted in entry of Judgments which, together with the partial summary Judgment entered in this adversary proceeding on December 15, 2006,  weigh upon allowance of Christian's and Northstar's Proofs of Claim.

The Judgment entered in Adversary Proceeding No. 06-00043 on June 5, 2006, rendered null and void all of Christian's and Northstar's construction liens and lis pendens filed against Harmony Court, including Lots 11A and 11B, and stated that Gatzke is free to market said lots and use the proceeds therefrom in his Chapter 11 Plan of Reorganization, which has since been confirmed.  The Memorandum of Decision entered in 06-00043 on June 5, 2006 (Docket No. 20)

concluded at pages 33 and 37 that record title to Harmony Court Lots 11A and 11B lies with the Gatzke Trust and Gatzke, not with Christian or any partnership. The Judgments entered in both 06-00043 and 06-00042 were not appealed and are now final and provide claim preclusion (res judicata) with respect to the issues decided therein.

The Judgment entered in Adv. No. 06-00042 on February 8, 2007 (Docket No. 34) was not appealed and is final. That Judgment awarded the ownership in the Bobcat, Caterpillar and other equipment to Gatzke, but notwithstanding that Judgment Christian continues to assert ownership in the equipment, and claims that the profit from Harmony Court is more than sufficient to pay for it. Tr., pp. 179, 181-182.

Christian testified that Gatzke wrongfully repossessed the Bobcat and Caterpillar equipment. Tr., p. 181, 182. His Proof of Claim No. 10 includes $420,425 for that equipment. Christian testified that Gatzke told him that the equipment was Christian's, but he admitted that he has nothing in writing proving his ownership, except equipment leases and checks. Tr., pp. 183[44], 184. Christian testified that $168,000 paid on the equipment lease payments were used as a downpayment for the purchase of that equipment, which advantaged Gatzke. Tr., pp. 182, 184. Christian admitted that Gatzke was the source of all financing, and the financing was all in Gatzke's name, but he insists that Gatzke "was buying the equipment on my behalf". Tr., p. 182. Christian testified that he could get financing to pay Gatzke for the lease payments made, but only if he had possession of the equipment. Tr., p. 186.

The next item on Christian's Proof of Claim No. 10 is $6,124.37 in expenses paid by Christian toward Harmony Court development. Ex. 54, at pages 4 and 5 includes a table of

---

[44]They were discussing the 320 excavator.

expenses which Christian testified total the $6,124.37.  Tr., p. 189.  Those expenses include a

$130 amount for attorney Jim Bartlett for "Fees to review contracts on Harmony, Keystone, etc."

Ex. 54, p. 4.  The evidence includes Bartlett's bill for a $130 charge dated January 2004

described as preparing a note and mortgage for Christian's use with Lyle Gillard.  Christian

testified that if Gillard is one of the names associated with Cedar Park then the $130 charge

would be attributed to Cedar Park.  Tr., p. 190.  Ex. 49 lists Lyle Gillard as the lender of the

unsigned note and mortgage involving Cedar Park, and Christian testified that Bartlett prepared

Ex. 49.  Tr., p. 191.  Christian admitted his mistake including the $130 charge to Harmony Court.

Tr., p. 192.

   Ex. B consists of  several miscellaneous receipts produced by Christian, for some of which

Gatzke offered to give credit.  Murphy advised the Court that Ex. B supports the component of

Christian's Proof of Claim No. 11 expenses paid by Christian toward development of Harmony

Court in the amount of $6,124.37[45].  Gatzke testified that he would give Christian credit for the

entries on Ex. B including cash receipt ($100), tax receipts ($614.39 and $481.76), Northwestern

Energy ($184.79), Flathead County Solid Waste District ($1,800.25), Whitehead Trucking

($495.00), clerk and recorder ($44 total), Flathead Electric Co-op ($109, $47, $73, $109, $70,

$47, $24), Flathead County Water District #1 – Evergreen ($50.47, $64.22, $85.47), Western

Building Center ($2.58), clerk and recorder ($1.75), and Ken Pedersen Pumping Service

($400.00).  Tr., pp. 372-382.  Gatzke would not agree to credit Christian with the other invoices

on Ex. B, but agreed to credit Christian the items listed above, which the Court finds total

---

[45]The transcript reflects confusion among the parties that the amount credited was $6,100
or $6,190 in Ex. 1.  Tr., pp. 377, 378.  Ex. 1 includes no such credit, but Christian's Proof of
Claim No. 10 includes the component of $6,124.37 for expenses paid by Christian.

$4,803.68 but Gatzke in his brief states and agrees to credit Christian with $5,394.37.

Christian testified regarding other invoices on Ex. B, including a cash register receipt from First Interstate Bank Evergreen in the amount of $624.10 which he testified was one month's payment to the Johnson escrow for property which became part of Harmony Court. Tr., p. 470. The next entry on Ex. B that Christian described was $600 to JC Mobile Homes, which Christian testified was to move a double wide because Keystone wanted to build on that lot right away so Christian had JC Mobile Homes move it to their storage lot. Tr., pp. 470, 471.

The next component of Christian's Proof of Claim No. 10 is his estimate of his percentage of profit from Harmony Court, which he calculated as $600,000.00 by taking $1,120,000 from the sale price of Harmony Court to Keystone, less engineering and acquisition cost of between $200,000 and $250,000, less the balance of infrastructure, paving and utility cost. Tr., pp. 194-195, 198. Christian admitted not knowing the sale price to Keystone was $600,000, or other sale proceeds, and that he estimated the engineering and other costs in arriving at his estimated claim for profit. Tr., pp. 195-196. Christian estimated that there would be a profit of $900,000 on Harmony Court for him to arrive at $600,000 by his two-third's share under their contract for deed, Ex. 13/D. Tr., p. 200.

The next component on Christian's Proof of Claim is $60,000 to acquire equipment to complete an ongoing project. Tr., pp. 200-201. Christian testified that he had to lease other equipment to complete his project at Wild Eyes when Gatzke took possession of the 320 loader. Tr., p. 200. Christian produced no invoices at trial or in discovery to substantiate his $60,000 claim. Tr., p. 200.

63

### G. **Credibility**

As in the previous two adversary proceedings involving these parties, it is necessary because of the conflicting testimony and claims to make a determination of the credibility of witnesses. Having observed Christian's demeanor while testifying under oath, the Court once again finds that Christian's testimony is not credible and is entitled to little probative weight without corroboration.[46] *In re Taylor*, 514 F.2d 1370, 1373-74 (9th Cir. 1975); *See also*, *Casey v. Kasal*, 223 B.R. 879, 886 (E.D. Pa. 1998). The Court bases its finding on Christian's lack of credibility based on his sworn testimony: (a) claiming not to know how Gatzke learned about Cedar Park when it was Christian who approached Gatzke about Cedar Park (Tr., pp. 87-88; Ex. 37, p. 130); (b) blaming Gatzke's lis pendens for Christian's default on the church property payments due August 2005 when Ex. 58 shows Gatzke's lis pendens was not filed until November 7, 2005 (Tr., pp. 150-152, 486-488), and in particular (3) Christian's testimony that Gatzke "*knew that we always made good on the loans*." Tr., p. 160 (emphasis added). The extensive record in these related adversary proceedings shows that Christian's payments to Gatzke on any given project were rare, not regular or timely. Christian's contention appears to be that saying in effect "put it on my tab" is equivalent to always making good on loans. Accordingly, the Court assigns Christian's testimony little probative weight without corroboration.

In addition, Christian has been sanctioned in this adversary proceeding for failure to comply

---

[46]In Adv. No. 06-00043 the Court found that Christian's credibility was diminished and gave less probative weight to his testimony after he was impeached. Memorandum, at pp. 41-42. The Court also found Christian's testimony not credible in Adv. No. 06-00042, based on his testimony contradicted by vehicle titles. Memorandum, at p. 15.

with discovery, and in other proceedings the Court admonished Christian about the need to produce documents in response to discovery. In the instant adversary proceeding, Christian testified that he keeps a small tablet or book in his pocket on which he writes a great deal of information, and he admitted that he has never produced those for Gatzke in response to discovery requests. Tr., p. 194. "[F]ailure to produce evidence, which under the circumstances would be expected, gives rise to a presumption against the party failing to produce it."). *N.L.R.B. v. Advance Transp. Co.*, 965 F.2d 186, 195 (7th Cir. 1992), quoting *P.R. Mallory Co. v. NLRB*, 400 F.2d 956, 959 (7th Cir.1968), *cert. denied*, 394 U.S. 918, 89 S.Ct. 1191, 22 L.Ed.2d 452 (1969). Given Christian's failure to produce evidence in this adversary proceeding, it is appropriate for the Court to presume that evidence against Christian.

## DISCUSSION

### A.  Ownership of Cedar Park

Gatzke contends that Christian's claim of a profit sharing arrangement in Cedar Park is barred by Montana's statute of frauds because no such agreement exists in writing, as contrasted with the parties' written agreement, Ex. 13/D, which contains a profit sharing provision for Harmony Court. Gatzke argues that he purchased Cedar Park from Christian when Christian ran out of financing options and Gatzke was his last resort, and that after experiencing Christian's delay in completing Harmony Court's infrastructure Gatzke was neither interested in another profit sharing arrangement with Christian nor interested in permitting Christian to develop Cedar Park's infrastructure, except under the oversight of a professional contractor that Christian failed to accept. Gatzke requests the Court declare that Christian and his related companies have no interest in Cedar Park and no right to any proceeds from its sale. Gatzke also requests that the

Court order that Christian's lis pendens on Cedar Park be expunged from the public record.

Christian seeks in his Proof of Claim No. 10 ownership in 2/3 of the profits from Cedar Park.  He argued that he would not sell Cedar Park at a loss to Gatzke and lose out on all his work obtaining PUD approval or the ability to work on the infrastructure himself, and that he and Gatzke had an understanding that they would have a profit sharing arrangement similar to Harmony Court.

Montana presumes that a person possessed of the record title is the lawful owner.  *U.S. v. Nava*, 404 F.3d 1119, 1129 (9th Cir. 2002).  "Generally speaking there is a presumption that the ownership of real estate is where the muniment of title places it."  *In re Hunter's Estate* (1951), 125 Mont. 315, 324, 236 P.2d 94, 99; *In re Perry's Estate* (1948), 121 Mont. 280, 287, 192 P.2d 532, 536.  There are two unassailable ways to acquire nonassailable fee title to real property – by transfer or conveyance by devise, gift or common sale; or by adverse possession.  *Nava*, 404 F.3d at 1129.; *Luloff v. Blackburn* (1995),  274 Mont. 64, 69, 906 P.2d 189, 192.  Adverse possession is not at issue in the instant case.

Montana's statutes of frauds provides that any sale or transfer of real property (other than an estate at will or a lease for a term less than one year) must be in writing and signed by the grantor.  MONT. CODE ANN. ("MCA") §§ 28-2-903, 30-11-111, and 70-20-101; *Luloff v. Blackburn*,  274 Mont. at 68, 906 P.2d at 191.  Thus, generally if a grant of real property does not comply with the statute of frauds it is invalid.  *Luloff v. Blackburn*,  274 Mont. at 68, 906 P.2d at 191; *Isaak v. Smith* (1993), 257 Mont. 176, 848 P.2d 1014; *Quirin v. Weinberg* (1992), 252 Mont. 386, 830 P.2d 537.

Record title to Cedar Park is readily discernable from the exhibits in evidence.  The Gatzke

Trust acquired fee title to Cedar Park by a buy-sell agreement, Ex. 30, for which Gatzke paid in full at closing according to the stipulated facts, and received a warranty deed granting him Cedar Park signed by Irving Schaffer, Ex. 32, which was recorded.  Christian produced no documentary evidence granting him an ownership interest in Cedar Park, or the profits therefrom.  The parties knew how to enter into a profit sharing agreement, as they did in Ex. 13/D involving Harmony Court, but they did not enter into any such agreement on Cedar Park.  Ex. 30, page 3, under "Entire Agreement" provides that the Agreement "can be modified only in writing, signed by the Seller and Buyer."  No writing exists in evidence signed by Gatzke and Schaffer granting Christian a share of profits.

The Court gives no weight to Christian's opinion or testimony that the deed, Ex. 32, is defective in its crossing out Northstar Properties' name and substituting the Gatzke Trust.  Jackie Phillips testified that she typed in the Gatzke Trust's name as buyer pursuant to Christian's authority and while he was present and approved it.  Ex. 47, p. 13.  Christian denied telling her to make the change but the Court gives his denial no weight.  The evidence shows that Christian was on the verge of losing the property and his entire investment, and the Court finds that Phillips' testimony is credible.  Christian offered no case authority or expert testimony in support of his argument that the deed drafted pursuant to his instructions is defective, and Christian shall not be allowed to benefit from the condition of a deed for which he was responsible.

The Court finds that no understanding exists between Gatzke and Christian to share profits in Cedar Park.  No document exists in evidence reflecting such an understanding, and even Christian agreed with Gatzke's testimony that Gatzke was unwilling to share profits, or to hire Christian to install the infrastructure, despite Christian's strong desire.  At the time of Gatzke's

67

closing on Cedar Park he was aware of delays in Christian's completion of the Harmony Court infrastructure and, finally, he was unwilling to award Christian the Cedar Park infrastructure contract. True to form, Gatzke continued to try to help Christian by offering to urge the professional contractor he ultimately hired to give Christian work, but Christian spurned that offer.

Christian's claim to profits in Cedar Park is evidenced only by his strong desire that it be so, but that fails to overcome the presumption of ownership of Cedar Park in the person of record title, Gatzke.

**B. Breach of Contract**

Gatzke contends that Christian breached his contract with Gatzke to complete the Harmony Court infrastructure on time for the agreed amount of $230,000. Because it took Christian more than 12 months for Christian to complete the Harmony Court infrastructure instead of the ten weeks by which Stauffer testified it could have been completed, Gatzke argues that Christian breached his contract with Gatzke and MCA § 28-3-601's requirement that a contractually-required act must be performed in a reasonable amount of time.

Montana's applicable statute of frauds requires that certain agreements are invalid unless in writing, including MCA § 28-2-903(1)(a) ("an agreement that by its terms is not to be performed within a year from the making thereof"). *See, e.g., In re Beckstrom*, 14 Mont. B.R. 56, 66 (Bankr. D. Mont. 1995) (construing § 28-2-903(1)(a)). The Court, however, infers from the evidence in this case that Gatzke and Christian intended the infrastructure to be completed within one year, given the sale of lots to Keystone in November 2003, Ex. 17, and the testimony that Keystone wanted to commence construction on March 1, 2004. Given the delay in Keystone

commencing construction because of the delays in Christian completing the infrastructure work, Gatzke and Keystone executed a subsequent agreement dated March 25, 2004, Ex. 19. Furthermore, Christian had partially completed the infrastructure work as contemplated by Gatzke and Christian, thereby under the doctrine of part performance, removed the oral construction contract from the statute of frauds. *Fox v. Fifth West, Inc.* (1969), 153 Mont. 95, 99, 454 P.2d 612, 614-15.[47]

The parties' unwritten agreement for Christian to install infrastructure at Harmony Court was made in December of 2003, and Christian was still working on the infrastructure more than a year later, however he had partially performed the required infrastructure work.  Because the terms of the agreement for the infrastructure work were not reduced to writing, the Court is unwilling to find Christian in breach of the oral agreement based on the delay, when the Court finds that the parties did not expressly provide that time would be of the essence.  MCA § 28-3-603.  The Court notes that the contract for deed between Gatzke and Christian for Christian's acquisition of Harmony Court lots did include a "time of the essence" provision, but also included a remedy of an accounting to consider the costs involved in developing the Harmony Court lots.  Gatzke argues that the delay was too long and prevented Keystone from commencing construction, but Gatzke awarded Christian the contract to install infrastructure in the winter, under strict time constraints, knowing that Christian had a history of not finishing projects and knowing that Christian had never installed a sewer or water system for a subdivision of this size.

Gatzke cites Stauffer's testimony that the project should not have taken more than 10 weeks,

---

[47]The Court notes that in 1999, the Montana Legislature adopted extensive provisions for the payment of construction contractors and subcontractors and breaches associated therewith. MCA §§ 28-2-2101 through -2117.

but Stauffer also testified that it would be a stretch and that Christian got off to a good start until he ran into problems with the grade of the sewer line, a problem which the record is unclear about since Stauffer set the benchmarks for the sewer line. Stauffer also testified that they knew they could not pave until April or May when the batch plants opened. Tr., p. 248.

Finally, Gatzke's wisdom in agreeing to hire an inexperienced Christian, knowing his history of not finishing projects on time, and knowing Christian would need to install infrastructure in the winter without prior experience, is demonstrated in Gatzke's own evidence. Ex. 18, discusses cold weather construction concerns: "A good contractor will be aware of those things, but a good contractor won't be proposing to work in the winter anyway."

Based on the above considerations, and Gatzke having a remedy in the form of the accounting discussed below, the Court declines to award Gatzke damages against Christian for breach of their unwritten contract to install infrastructure in a reasonable amount of time under MCA § 28-3-601.

Gatzke failed to prove the existence of a written agreement whereby Christian agreed to pay Gatzke rent for the Caterpillar equipment and Bobcat. In fact, Gatzke made lease payments to the dealers at the request of Christian, which were to be deducted from Christian's share of the profit under the contract for deed. Gatzke subsequently negotiated a purchase for the leased equipment with a credit toward the purchase price for the previously paid lease payments. The lease payments, as costs included in the accounting, will be considered in the following discussion on the accounting.

### C. Negligence

Gatzke contends that Christian breached his duty to follow the approved plans and install the

Harmony Court infrastructure with due care and in a workmanlike manner by failing to: initially install swales, properly construct a cul-de-sac, complete the infrastructure in a reasonable amount of time, and hire an experienced and competent crew. Gatzke refers to Stauffer's testimony regarding his having to demonstrate basic tasks to the crew, and how Christian had to relay the sewer line at the proper grade. Gatzke argues that Christian's negligence caused Gatzke damages in the amount of thousands of dollars in additional costs to complete and correct the infrastructure.

Gatzke cites *St. Paul Companies v. Const. Mgmt. Co., Ltd.*, 96 F.Supp.2d 1094, 1097 (D. Mont. 2000) in support of his negligence claim, where the district court found persuasive cases that held a general contractor, who has a duty to perform a construction contract with due care and in a good and workmanlike manner, liable to the owner for damages when an independent contractor hired by the general contractor performs negligently and causes property damage to the owner. (Cases omitted). In Adv. No. 06-00042, in rejecting Gatzke's equitable claims against Christian based on unjust enrichment and quantum meruit, the Court cited the fundamental maxim of jurisprudence in Montana states: "The law helps the vigilant before those who sleep on their rights." MCA § 1-3-218; *In re Woodtech, Inc.*, 13 Mont. B.R. 59, 65 (Bankr. D. Mont.1993); *Mistic v. Industry Financial Corporation (In re Mistic)*, 10 Mont. B.R. 282, 296 (Bankr. D. Mont. 1992). The Court concluded that Gatzke was not vigilant in protecting his rights as an owner of the equipment.

Similar considerations persuade the Court that Gatzke may not recover from Christian based on a negligence claim. Under examination by his own attorney Gatzke testified that he observed a pattern in his ten years of dealing with Christian that he does not finish projects on time. Tr., p.

71

382-383.  Having seen Christian's pattern of not finishing projects on time, in the Court's view Gatzke was negligent if not reckless in entrusting Christian to complete the Harmony Court infrastructure on time, during the winter.  Gatzke knew of Christian's history of not finishing projects, and his inexperience, and knew from his own Ex. 18 that a good contractor would not work installing infrastructure during the winter.  Such facts were obvious red flags, which should have warned Gatzke and prompted him to exercise vigilance, but instead he contracted with Christian to install subdivision infrastructure for the first time, during the winter, under a compressed time schedule, and then Gatzke went to Kenya.

In Montana comparative fault and comparative negligence diminish damages allowed to a person in proportion to the percentage of negligence or fault attributable to the person recovering.  MCA § 27-1-702 (temporary).  Section 27-1-701, MCA, making persons responsible for injury occasioned to another by want of ordinary care or skill, concludes "except so far as the latter has willfully or by want of ordinary care brought the injury upon himself."  The Court acknowledges Stauffer's opinion that Christian's delays in completion and hiring of an inexperienced crew fell short of the standard of care for a reasonable competent contractor.  The evidence, however, further, shows that Gatzke was aware of Christian's history of lack of performance yet failed to exercise vigilance by contracting with Christian to install the Harmony Court infrastructure.  The Court finds that Gatzke's knowing lack of vigilance and want of ordinary care bars his claim for negligence under § 27-1-701.

### D. **Harmony Court Accounting**

Gatzke's Ex. 1 concludes that Christian owes him $733,368.86 at page 4, but Gatzke agreed to revise his accounting summary to reflect credits to Christian reducing the total in his

72

accounting summary attached to his brief in the amount of $725,974.409.  In addition Gatzke is willing to credit Christian for Harmony expenses paid in the amount of $5,934.37[48], and for the $23,000 insurance payment Gatzke received for the excavator.

Christian admits that Gatzke paid off the purchase of Harmony Court, and that Gatzke paid for the lease of Caterpillar equipment.  But Christian contends that he owes Gatzke nothing and that Gatzke owes him.  Christian argues that Gatzke's claim based on the equipment payments is worth only $30,000 for the net amount Gatzke lost on the drilling rig, because Gatzke failed to take into account the proceeds from the sale of equipment and the $23,000 insurance proceeds. Christian contends that Gatzke received $6,798.27 more from the equipment than he paid, and still has the Wacker, and so the equipment is a wash because Christian should get credit for the sales and insurance proceeds.

Christian argues he owes nothing for equipment rental after March 31, 2005, because their agreement was for Christian to buy the equipment from his profits.  Christian argues he should not be responsible to Gatzke for the $14,163.50 in Schwarz invoices on Cedar Park because they were incurred ten months before Gatzke acquired title and Gatzke got the use and benefit of that work.

Turning to Harmony Court, Christian contends that they agreed to develop and sell vacant subdivision lots, and Christian did not consent to build townhouses or houses and is not responsible for housing development costs.  Christian argues that the only appropriate gross revenue figure is $1,190,000, the amount of the Keystone contracts, plus $90,000 for Lots 11A and 11B bringing the total revenue to $1,280,000.  Christian argues that only $264,386.08 for

---

[48]This amount will be discussed below regarding allowance of Christian's Proof of Claim.

general development and $230,000 for infrastructure are appropriate expenses for the accounting, and all remaining amounts were for equipment which Gatzke recovered by sale of equipment. Christian argues that the $69,936.47 in infrastructure costs incurred after January 19, 2005, all were incurred after Schwarz notified the Flathead County Commissioners in Ex. 22 that all infrastructure was complete, and after Christian's work was done, so should not be part of the claim against Christian.  Christian totals the costs in the amount of $594,386.79, leaving a profit of $685,613.21, based upon which Christian argues his two-thirds share is $457,098.33.  Then Christian deducts amounts paid on behalf of Northstar and Northwest pipe, the extra $20,000 over the bid amount paid, additional amounts totaling $152,439.05, and $30,000 owed for the drill rig.  Christian concludes that he is owed a net amount of $112,963.54.

The Court has problems with the manner in which both sides interpreted the agreement, Ex. 13/D, and their methods of accounting.  The parties negotiated their written agreement to share profits over several drafts, and with the assistance of an attorney.  While not a model of clarity, Ex. 13/D clearly provides for payment of costs "before the sharing of profits takes place":

> Purchaser covenants and agrees to pay to Seller such sum as the parties have calculated for the initial costs of a project known to them as Harmony Court, (the "ACCOUNTING" which is ATTACHED HERETO), plus such additional costs as may accrue, plus the sharing of profits beyond the such "Accounting" amount to be paid to Seller, with Seller to receive 1/3rd of the profit and Buyer to receive 2/3rds of the profit associated with the sale of the real property known by the parties as Harmony Court.  The "Accounting" if not attached hereto at the time this contract is signed, shall be attached no later than February 15, 2004. Purchaser agrees to do likewise by said date.

> Since the "Accounting" amount to be paid to Seller by Buyer, *before the sharing of profits takes place*, will increase over time, the original "Accounting" attached hereto will be modified by one or more additional "Accounting" document(s), which will then be initialized and attached hereto.

> As the parties attach a new "Accounting" they shall initialize it, whereupon the amount due as shown by the "Accounting" will be deemed conclusive and binding on each party; so if any dispute arises concerning the amount to be paid to Seller, before the sharing of profits takes place, the dispute will only involve the expenses and costs and amount claimed due or claimed not due subsequent to the last "Accounting" document bearing the parties['] initials, which is attached hereto.

(Emphasis added).

Both sides, Gatzke at Ex. 1, page 2, and Christian in his brief, calculate an intermediate stage of profit before proceeding to deducting the cost overruns from the Harmony Court infrastructure.  "In the construction of an instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all."  MCA § 1-4-101.  Further, "[t]he terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a local, technical, or otherwise peculiar signification and were so used and understood in the particular instance, in which case the agreement must be construed accordingly."  MCA § 1-4-107.

Applying these principals to the provisions of Ex. 13/D governing prices and terms, and finding no peculiar signification, this Court finds that as Seller, Gatzke is entitled to all initial costs "plus such additional costs as may accrue" as calculated in the accounting "before the sharing of profits takes place."  Christian, and occasionally Gatzke, referred to Christian's request that certain costs and loans be taken from his profits.  But what Ex. 13/D requires is that any such costs and loans, if agreed, be added to the accounting and paid to Gatzke "before the sharing of profits takes place."

This interpretation makes sense, and is the only way to explain why Gatzke, who they agreed would provide financing for the project, agreed to only a 1/3 share of profits.  He agreed because Christian was obligated to repay him for all costs "before the sharing of profits takes place", thus (he thought) protecting his capital investment and guaranteeing a return.  For Christian, the arrangement gave him incentive to minimize costs and provide prompt accountings so as to arrive at the sharing of profits.

Christian, however, failed to comply with the requirement to provide an initial accounting or additional accounting documents, despite Gatzke's constant demands for copies of invoices.  Christian's failure to provide the accounting, like his failure to comply with discovery, weighs the evidence against him.  Thus, with certain adjustments the Court adopts Gatzke's Ex. 2, and Ex. 1, pages 1 and 2.

The Court rejects Christian's accounting at the first line, which fixes the revenues at $1,190,000, the amount of the Keystone contract, to which Christian argues he agreed.  The uncontroverted evidence is that Keystone only paid Gatzke a total of $600,000, which was not the agreed purchase price under Ex. 17.  Tr., p. 351.  Christian's subsequent calculations are meaningless.

The general ledger amounts in Ex. 2 related to Harmony Court infrastructure and construction, as reflected in Ex. 1, are adopted with certain exceptions.  Ex. 13/D in no way limited Christian's liability for costs to development of infrastructure for vacant lots.  Christian's failure to timely perform delayed Keystone's construction and contributed to its default, forcing Gatzke to take back the Harmony Court lots and finish the development in order to protect his investment.  Any uncertainty about whether Christian's purchases at Northwest Pipes on pages 6

76

through 8 of the general ledger in Ex. 2, using Gatzke's American Express account, were for Harmony Court, is weighed against Christian, who failed to produce the invoices despite Gatzke's demands. "No one can take advantage of his own wrong." MCA § 1-3-208.

The requirement in Ex. 13/D that Gatzke is entitled to payment of all costs before the sharing of profits brings in the other costs related to Harmony Court in the general ledger, whether related to Harmony Court directly or included at Christian's request. Christian told Gatzke to take the loans and equipment payments out of his share of profits, without appreciating that before any profits, Ex. 13/D, required Christian to account for and pay Gatzke all costs before the sharing of profits.

That principal applies to the Bobcat and Caterpillar charges at pages 8 and 9 of the general ledger in Ex. 2. Christian argues that he should get credit for Gatzke's sale of the Caterpillar equipment and Bobcat after repossession, as shown by Ex. 57, but the Court does not agree. Gatzke's lease and purchase of the Bobcat and Caterpillar equipment were made after the original understanding that Christian would ultimately pay for all the equipment. Indeed, Ex. 13/D requires repayment of those costs like any others. When Christian failed to provide accountings, failed to make the lease payments he breached the parties' agreement. Gatzke's subsequent purchase, repossession and sale of the Caterpillar equipment and Bobcat were in reasonable mitigation of his damages but in no way relieved, released or excused Christian of his liability to Gatzke for his costs under Ex. 13/D. Christian argues that he should own the equipment if charged with Gatzke's costs, but the equipment is almost all sold and Christian failed to pay for it. "He who takes the benefit must bear the burden." MCA § 1-3-212.

Gatzke already has waived his claim for $10,000 in repossession expenses and agreed to

credit Christian with $23,000 in insurance proceeds.  To further credit Christian with the fruit of

Gatzke's mitigation efforts and excuse his liability for costs under Ex. 13/D, in this Court's view,

would constitute unjust enrichment.

From Ex. 1/A and the adjustments above the Court finds the following summary of

accounting:

| | | |
|---|---|---|
| Harmony Court Income: | $2,933,818.06 | |
| Harmony Court Infrastructure Expenses: | 3,014,019.53[49] | |
| Profit/(Loss): | | ($80,201.47)[50] |

Additional amounts allowed Gatzke under Ex. 13/D:

| | | |
|---|---|---|
| Payment to Rocky Mountain Lumber to settle its liens: | $50,000.00 | |
| Advances to Christian: | 50,000.00 | |
| Total losses: | | $180,201.47 |

Credits agreed to by Gatzke:

| | | |
|---|---|---|
| Insurance received on excavator: | $23,000.00 | |
| Credit for possible double charge: | 2,000.00 | |
| Credit for Christian's downpayment on Bobcat: | 2,500.00 | |
| Total Credits agreed to by Gatzke: | | $ 27,500.00 |

Net Amount due Gatzke from Christian for Harmony Court under Ex. 13/D:  **$152,701.47.**

This amount, which the Court finds Christian owes Gatzke based on their written agreement

Ex. 13/D, does not include the charges listed on Ex. 1, pages 3 and 4, for unpaid equipment

rental, for reimbursements regarding Schwarz invoices paid by Gatzke and other reimbursements

involving non-Harmony Court properties, "unknown" amounts for several categories including

rent, stolen gravel, attorney's fees previously awarded in this case and Adv. Nos. 06-00042 and

---

[49]Including $367,095.87 in infrastructure cost overruns.  Ex. 1; Ex. 2

[50]With the costs exceeding the expenses, the $600,000 component of Christian's claim on Proof of Claim No. 10 is disallowed in its entirety.  There was no profit from Harmony Court.

06-00043 which are the subject of separate judgments, and future warranty work on Harmony

Court.  This award is without prejudice to the parties' right to assert those claims in another

appropriate forum to liquidate non-Harmony Court amounts.

### E.  Gatzke's Objections to Defendants' Proofs of Claim

This Court discussed the applicable law governing the burden of proof for allowance of

claims in *In re Eiesland*, 19 Mont. B.R. 194, 208-09 (Bankr. D. Mont. 2001):

> A validly filed proof of claim constitutes *prima facie* evidence of the claim's
> validity and amount.  F.R.B.P. 3001(f).  The Ninth Circuit recently explained the
> general procedure for allocating burdens of proof and persuasion in determining
> whether a filed claim is allowable in *Lundell v. Anchor Const. Specialists, Inc.*,
> 223 F.3d 1035, 1039 (9th Cir. 2000):

> > A proof of claim is deemed allowed unless a party in interest objects
> > under 11 U.S.C. § 502(a) and constitutes "*prima facie* evidence of the
> > validity and amount of the claim" pursuant to Bankruptcy Rule 3001(f).
> > See also Fed. R. Bankr.P. 3007. The filing of an objection to a proof of
> > claim "creates a dispute which is a contested matter" within the meaning
> > of Bankruptcy Rule 9014 and must be resolved after notice and
> > opportunity for hearing upon a motion for relief. See Adv. Comm. Notes
> > to Fed. R. Bankr.P. 9014.

> > Upon objection, the proof of claim provides "some evidence as to its
> > validity and amount" and is "strong enough to carry over a mere formal
> > objection without more." *Wright v. Holm (In re Holm )*, 931 F.2d 620,
> > 623 (9th Cir.1991) (quoting 3 L. King, Collier on Bankruptcy § 502.02,
> > at 502-22 (15th ed.1991)); *see also Ashford v. Consolidated Pioneer
> > Mort. (In re Consol. Pioneer Mort.)*, 178 B.R. 222, 226 (9th Cir. BAP
> > 1995), aff'd, 91 F.3d 151, 1996 WL 393533 (9th Cir.1996). To defeat the
> > claim, the objector must come forward with sufficient evidence and
> > "show facts tending to defeat the claim by probative force equal to that of
> > the allegations of the proofs of claim themselves." *In re Holm*, 931 F.2d
> > at 623.

> > * * * *

> "If the objector produces sufficient evidence to negate one or more of the
> sworn facts in the proof of claim, the burden reverts to the claimant to

79

prove the validity of the claim by a preponderance of the evidence." *In re Consol. Pioneer*, 178 B.R. at 226 (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir.1992)). The ultimate burden of persuasion remains at all times upon the claimant. *See In re Holm*, 931 F.2d at 623.

*See also Knize*, 210 B.R. at 778; *Matter of Missionary Baptist Foundation of America*, 818 F.2d 1135, 1143 (5th Cir.1987); *In re Stoecker*, 143 B.R. 879, 883 (N.D.Ill.1992), *aff'd in part, vacated in part*, 5 F.3d 1022 (7th Cir.), *reh'g denied* (1993).

Thus, the Bank's Proof of Claim No. 2 is *prima facie* evidence of the validity and amount of its claim under Rule 3001(f), and the Debtor has the burden of showing sufficient evidence and to "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *Lundell*, 223 F.3d at 1039 (quoting *Holm*). This Court finds that Eric, as the objecting party, has not produced sufficient evidence to cause the burden to revert to the Bank to prove the validity and amount of its claim. *Lundell*, 223 F.3d at 1039 (quoting *In re Consol. Pioneer*, 178 B.R. at 226).

The analysis under *Lundell v. Anchor Const. Specialists* ("*Lundell*") was reiterated by the Ninth Circuit in *In re Los Gatos Lodge, Inc.*, 278 F.3d 890, 894 (9th Cir. 2002).

From the analysis above the Court finds that Gatzke has produced sufficient evidence to revert the burden to Christian to prove the validity and amount of Proofs of Claim Nos. 10 and 11.

Gatzke contends that Christian failed to satisfy his burden of proof to establish the validity and amounts of Proofs of Claim Nos. 10 and 11, except for $5,394.37 which Gatzke agrees Christian should be credited on Proof of Claim 10. With respect to Northstar Development's Proof of Claim No. 11, Gatzke argues that Christian offered no evidence to support Northstar Development's claim, and all of Defendant Northstar's liens were avoided in this Court's Memorandum of Decision (Docket No. 28) and Judgment (Docket No. 55) entered on summary judgment, and in Adv. No. 06-43, and therefore Proof of Claim No. 11 should be disallowed.

With respect to the other components of Proof of Claim No. 10 filed by Christian, Gatzke argues that Christian failed to offer any evidence of the cost of replacement of repossessed equipment or $60,000 to acquire equipment, and argues that that all the Caterpillar equipment and Bobcat and attachments were determined to belong to Gatzke in Adv. No. 06-00042.  Gatzke does not dispute $5,394.37 of the charges incurred by Christian on Ex. B, but contends the rest should be denied because Christian failed to produce receipts for years until the eve of trial.

Turning first to Northstar Development's Proof of Claim No. 11, the avoidance of the construction liens requires disallowance of Proof of Claim No. 11 as a secured claim. Defendants' offered no evidence at trial establishing that Northstar Development had a right to payment from Gatzke under 11 U.S.C. § 101(5)(A) based on a written agreement, or otherwise. Christian's brief admits that Gatzke overpaid Christian above the $230,000 agreed amount for infrastructure.  Defendants offered no other evidence to support a right to payment from Gatzke and thus failed their ultimate burden of proof under *Holm*, 931 F.2d at 623.  Proof of Claim No. 11 shall be disallowed in its entirety.

With respect to Christian's claim for $600,000 for percent of profit from Harmony Court on Proof of Claim No. 10, Gatzke correctly observes that Harmony Court made no profit, and therefore Christian's claim for $600,000 profit, which was proven incorrect in Christian's brief, must be disallowed.  The components of Proof of Claim No. 10 for expenses incurred by Christian to obtain replacement equipment, to acquire equipment to complete an ongoing project, and value of equipment in which Christian claims ownership wrongfully taken, involve issues which were decided in Gatzke's favor in Adv. No. 06-00042 and are the subject of a final judgment which found Gatzke to be the sole owner of all the equipment repossessed from

Christian by Gatzke.  Those components of Proof of Claim No. 10 are all disallowed under principles of preclusion.

The final component of Proof of Claim 10 is $6,124.37 in expenses paid by Christian towards Harmony Court.  Gatzke concedes that Christian should be credited $5,394.37, but not the remainder.  Based upon Christian's failure to produce invoices and an accounting to Gatzke for years, the Court finds that, except for $5,394.37, Christian has failed to establish the validity of his claim by a preponderance of the evidence.  *In re Consol. Pioneer*, 178 B.R. at 226; *Holm*, 931 F.2d at 623.  Proof of Claim No. 10 will be allowed in the amount of $5,394.37 as an unsecured, nonpriority claim subject to the terms of the confirmed Plan.

### F.  Attorneys' Fees

Plaintiff prays for an award of attorneys' fees and costs.  No general right to recover attorney's fees exists under the Bankruptcy Code.  *In re Montgomery*, 310 B.R. 169, 184 (Bankr. C.D. Cal. 2004); *Renfrow v. Draper*, 232 F.3d 688, 693 (9th Cir.2000); *Ford v. Baroff (In re Baroff)*, 105 F.3d 439, 441 (9th Cir.1997).  The "American Rule" denies attorney's fees in the absence of contract, applicable statute, or other exceptional circumstances, and any exceptions to the American Rule are narrowly circumscribed.  *In re Acequia*, *Inc.*, 34 F.3d 800, 819 (9th Cir. 1994) (quoting *Richardson v. Alaska Airlines, Inc.*,750 F.2d 763, 765 (9th Cir. 1984)).  But the United States Supreme Court recently noted that the default rule can be overcome by statute or an enforceable contract.  *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, __ U.S. __, __ S.Ct. __ , 2007 WL 816795 (2007).

Ex. 13/D includes a provision entitled "Attorney Fees on Breach":

In the event either party fails to perform, comply with, or abide by each and every

> agreement, condition, and covenant in this Contract, such defaulting party shall
> pay all costs, charges, and expenses, including reasonable attorney fees,
> reasonably incurred by the non-defaulting party because of such default.

This provision of Ex. 13/D qualifies as an exception to the American Rule, but only with respect to Gatzke's claims based upon Christian's default in the accounting and paying Gatzke costs as required by Ex. 13/D.  It does not provide for an award to Gatzke of his attorney fees and costs incurred in relation to Gatzke's claims for relief based on breach of oral contract or negligence.  As the prevailing party in an action for an accounting based upon Christian's default of Ex. 13/D, Gatzke is entitled to attorney fees and costs under his contract with Christian.  The Court will closely scrutinize Gatzke's request for attorney fees and costs in order to ensure that the request is limited to that allowed based on Defendants' default under Ex. 13/D.

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334(b).

2.  This adversary proceeding is a core proceeding to recover property and money under 28 U.S.C. § 157(b)(2).

3.  Plaintiff proved that he is the owner of record of the Cedar Park subdivision in Tract 1 of Certificate of Survey No. 15526, lying in the NW1/4 of the NE 1/4 and in government Lot 2 of Section 17, Township 30 North, Range 20 West, P.M.M., Flathead County, Montana Flathead County, Montana.

4.  Defendants failed to satisfy their burden of proof to overcome the presumption that Gatzke is owner of Cedar Park, and failed to show that Christian is entitled to any interest in or share of any profits from the development of Cedar Park.

5. Plaintiff's claim for breach of an unwritten agreement is unenforceable under Montana's

statute of fraud, MCA § 28 -2-903(1)(a), as is Plaintiff's claim for equipment rental.

6.  Plaintiff failed to satisfy his burden of proof to establish a claim for negligence, and Plaintiff's knowing lack of vigilance and want of ordinary care in hiring Christian to install subdivision infrastructure bars his recovery and claim for negligence under MCA § 27-1-701.

7.  Plaintiff satisfied his burden of proof for an accounting of costs provided under the parties' written agreement, Ex. 13/D, and Plaintiff is entitled to an award from the Defendant James Christian based on that accounting in the amount of $152,701.47.

8.  Based on the parties' valid written agreement, Plaintiff is entitled to an award of attorneys' fees and costs from Defendants based upon their default in maintaining an accounting required under Ex. 13/D and failure to pay Plaintiff costs due under that accounting.

9.  Plaintiff satisfied his burden to overcome the prima facie effect of Proofs of Claim Nos. 10 and 11; and Defendants' failed to satisfy their ultimate burden that they have rights to payment from the Debtor, except for Proof of Claim No. 11 which Plaintiff concedes should be allowed in the amount of $5,394.37 as an unsecured, nonpriority claim.

**IT IS ORDERED** Plaintiff's attorneys are granted ten (10) days from the date of this Order in which to file their affidavit of attorneys' fees and costs incurred in relation to their claim for an accounting under the written agreement with the Defendants, Ex. 13/D; Defendants are granted a period of ten (10) days thereafter in which to file objections and request a hearing on the reasonableness of Plaintiff's claimed attorney fees and costs, and after a determination of Plaintiff's attorneys' fees and costs the Court will enter Judgment against Defendants James Christian, Northstar Properties, L.L.C., and Northstar Development of Montana, L.L.C., in conformity with the above, in favor of the Plaintiff Donald A. Gatzke in the amount of

$152,701.47 plus such attorneys fees and costs as awarded.

**IT IS FURTHER ORDERED** a separate Order shall be entered in the above-captioned Chapter 11 case in conformity with the above, sustaining Debtor's objections to Proofs of Claim Nos. 10 and 11, disallowing Proof of Claim No. 11 in its entirety, disallowing Proof of Claim No. 10 filed by James Christian in the amount of $1,101,599.37, and allowing James Christian an unsecured, nonpriority claim in the amount of $5,394.37.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana